**WAL–MART STORES, INC., Wal–Mart Puerto Rico, Inc., Supermercados Amigo, Inc., Plaintiffs,**

v.

**Anabelle RODRIGUEZ, in her Personal and Official capacity as Secretary of Justice of the Commonwealth of Puerto Rico, Defendant.**

No. CIV.02–2778 PG.

United States District Court, D. Puerto Rico.

Dec. 26, 2002.

Ruben T. Nigaglioni, Raul M. Arias-Marxuach, Veronica Ferraiuoli-Hornedo, McConnell Valdes, San Juan, PR, for Wal-Mart Stores, Inc, Wal-Mart Puerto Rico, Inc., Supermercados Amigo, Inc., plaintiffs.

Carlos Del-Valle-Cruz, Department of Justice, Federal Litigation Division, San Juan, PR, for Anabelle Rodriguez, Anabelle Rodriguez, in her Personal and Official Capacity as Secretary of Justice of the Commonwealth of Puerto Rico, defendant.

### OPINION AND ORDER—PRELIMINARY INJUNCTION

PEREZ-GIMENEZ, District Judge.

The parties, Wal-Mart Stores, Inc., Wal-Mart Puerto Rico, Inc., Supermercados Amigo, Inc. (collectively "Plaintiffs"), and Anabelle Rodríguez, Secretary of Justice of the Commonwealth of Puerto Rico ("Defendant" or "the Secretary"), having appeared at a hearing held before this Court on December 12, 16 and 17, 2002, and the Court having heard testimony and having received evidence presented by the Plaintiffs on the issues before it, and having heard arguments from both Plaintiffs and Defendants on the related legal issues, does hereby issue and order the following Findings of Fact, Conclusions of Law and Preliminary Injunction.

### FINDINGS OF FACT

During the Fall of the year 2001, Wal-Mart Stores, Inc. and Wal-Mart Puerto Rico, Inc. (collectively "Wal-Mart") conducted due diligence examinations to assess the possibility of acquiring Supermercados Amigo, Inc. ("Amigo"), a supermarket chain in the Commonwealth of Puerto Rico. Both Wal-Mart Puerto Rico, Inc. and Supermercados Amigo, Inc. are companies incorporated and having their principal place of business in the Commonwealth of Puerto Rico, while Wal-Mart Stores, Inc. is incorporated in the State of Delaware and has its principal place of business in the State of Arkansas.

### INVESTIGATIONS AND NEGOTIATIONS

#### February 2002—The Merger Executed

On February 5, 2002 the merger agreement between Wal-Mart and Amigo was signed and this originated a number of procedures that needed to take place before the closing of the transaction as part of the companies' integration process. This pre-closing process included negotiations with federal and state agencies that typically oversee this type of transaction in an effort to anticipate and remedy potential antitrust concerns. Plaintiffs' lawyers negotiated at length several aspects of the transaction with the Federal Trade Commission and the Puerto Rico Department of Justice ("PRDOJ"), and its Office of Monopolistic Affairs ("OMA").

Luis D. Martínez Rivera ("Martínez"), a Special Prosecutor who has worked at the OMA since 1997, was the main PRDOJ representative working on this case and was assisted for the most part by two economists from his office. Martínez, in charge of conducting the investigation pertinent to compliance with local anti-monopolistic laws, began to get involved in the Wal–Mart/Amigo merger transaction on February 11, 2002. Deputy Attorney General ("DAG") of the OMA, Irma Rodríguez–Justiniano ("Rodríguez–Justiniano"), supervised Martínez during the first months of the investigation and then, during the month of October 2002, José Díaz Tejeda ("Díaz–Tejeda"), who substituted Rodríguez as DAG of the OMA, began taking a much more active role in the investigation and negotiations with Wal–Mart.

Soon after the agreement to merge was announced, the OMA served Plaintiffs with a Civil Investigative Demand ("CID") which served as the basis for the OMA's request of all information that was being provided to the FTC. Since both agencies were conducting parallel investigations, Plaintiffs provided information simultaneously to the FTC and the OMA. These materials were sent to both agencies under a waiver of confidentiality so that the agencies could also share information between themselves. Pursuant to this waiver, formalized in a letter sent by Plaintiffs' lawyers to the FTC, the federal agency could provide the PRDOJ any materials they requested. (*See* Docket No. 21 at 178–179 & Pl.'s Ex. 8).

The FTC is the federal antitrust enforcement agency instituted pursuant to the Federal Trade Commission Act of 1914. 15 U.S.C. §§ 41–51. While the FTC conducts its investigations with careful regard of the federal antitrust laws, the Sherman Act, 15 U.S.C. § 1 *et seq.*, and the Clayton Act, 15 U.S.C. § 1 *et seq.*, the PRDOJ conducts its investigations pursuant to Article 16 of the Puerto Rico Anti-Monopoly Act, Law 77 of June 25, 1964, codified at 10 P.R. LAWS ANN. § 257 *et seq.*[1] (*See* 10 P.R. LAWS ANN. § 272). Unlike the FTC, however, the PRDOJ and OMA do not have regulations that govern or provide guidance in the conduct of divestiture investigations within a mergers and acquisitions context. Even Martínez, the main OMA investigator in this case, was not familiar with the FTC guidelines for divestiture and had not participated in the investigation of a divestiture in the past.

On February 6, 2002 Wal–Mart filed a Hart–Scott–Rodino Application with the FTC. The application is a notice to the FTC explaining that a company intends to merge with another company. The FTC then initiated a review process and investigation of the transaction and during the next few months, Wal–Mart prepared many documents requested by the federal agency. Once the FTC initiates an investigation, it typically culminates in an agreement between the agency and the acquiring party that consists of several consent decrees and orders. A consent package prepared by the FTC addresses every competitive problem present in the transaction and every geographical market with potential problems, as well as the

---

1. Nevertheless, in an article published a few years after the Puerto Rico Anti–Monopoly Act was signed into law and came into effect, Arturo Estrella wrote "[t]here is no doubt that the Puerto Rican statute of 1964 was basically inspired by the Federal legislation, from which it draws heavily, ..." and the state act establishes the same objectives as those of the federal antitrust statutes. Arturo Estrella, *Antitrust Law in Puerto Rico,* 28 Rev. Colegio de Abogados, 582–89 (1968).

required divestitures, if any, that remedy these problems.

### April 2002—Initial Contacts·

On April 17, 2002, Rodríguez–Justiniano sent a letter to Anthony George ("George"), in-house counsel at Wal–Mart, requesting that they prepare a white paper addressing a number of issues the OMA was interested in exploring. (Pl.'s Ex. # 11). Mark Schmidt ("Schmidt"), Vice President of Development in Wal–Mart, prepared much of the response to this letter. A white paper together with a summary spreadsheet reporting on local purchases and local suppliers with whom Wal–Mart had dealt since it arrived in Puerto Rico was sent to the PRDOJ on May 3, 2002. Schmidt, who has worked with Wal–Mart since 1987 and is responsible for mergers and acquisitions, was the principal negotiator on behalf of Wal–Mart with the PRDOJ.

Also in April 2002, a meeting was held attended by William Berkowitz ("Berkowitz"), attorney for Amigo, Steve Lausell ("Lausell"), Martínez, and an economist from the PRDOJ. Lausell was Chairman of the Board of Directors and a stockholder at Amigo and is now President of the Board of Directors and a stockholder of Supermercados Máximo ("Máximo"), the company that bought the four Amigo stores divested. During this meeting the representatives of Amigo offered to provide the OMA with whatever information they needed and they left the meeting with the impression that to this point, things were running smoothly in the Department with regards to their investigation of the transaction.

Finally, on April 22, 2002, Berkowitz wrote a letter addressed to Defendant, Rodríguez–Justiniano, and Martínez–Rivera detailing the legal and constitutional problems with their request for maintenance of local purchases from distributors,

manufacturers, and suppliers. He explained that there was no relationship between the antitrust laws and the purchase of goods from local or foreign-based distributors. He explained how the PRDOJ's demands suggested facial discrimination against out-of-state distributors and, moreover, were not within the scope of the antitrust laws. Defendant claimed to have no recollection of seeing this letter and Plaintiffs never heard from the PRDOJ in regards to the matters raised in it.

### May 2002—FTC's Expectations Revealed

During the month of May, Wal–Mart came to an understanding of what the FTC's expectations were before they would free the transaction of antitrust concerns. By then, the federal agency had identified the three geographical areas that raised monopolistic concerns: Cayey–Cidra, Ponce–Juana Díaz and Vega Baja–Manatí. The proposed plan, then, was to divest four stores in these areas, one in Cidra, one in Ponce, one in Manatí, and one in Vega Baja.

Even though the FTC gathers information on possible divestiture buyers, the onus is on the company requesting approval of a merger to find a potential buyer for the stores or locales that need to be divested. In order to comply with FTC expectations, Wal–Mart itself began looking for buyers for the four stores. During the summer months, the idea of a group of Amigo stockholders, among others, getting together to incorporate a company that would become the divestiture buyer began to emerge. Wal–Mart then submitted this group to the FTC as its selected buyer and once it received the FTC's approval, the selling process began.

Other potential buyers were not further investigated or considered because their initial interest never materialized into any-

thing concrete. Also, some of the other candidates had a strong presence in the geographical areas where the four stores were located and thus posed a threat of competition in those areas. Finally, there was no evidence introduced in the record about any bids higher than that of the group of Amigo stockholders, who later incorporated as Máximo. Martínez testified that he never heard of any bids higher than that by Supermercados Máximo.

The obstacles that led to a delay in implementing the FTC agreements were partly due to Plaintiffs' interest in reaching a "global settlement," that is, a settlement with all the parties involved. (Docket No. 21 at 183, ln. 12). Plaintiffs had the impression that although the PRDOJ was satisfied with the divestitures imposed by the FTC, it still had additional concerns, which included reporting requirements during a period of several years after the merger was implemented, and the level of Wal–Mart's purchases of goods from local versus foreign distributors and suppliers. (Docket No. 21 at 184, lns. 10–15). But the PRDOJ had also communicated to the FTC that they believed the proposed divestiture of four stores was not enough for antitrust concerns. Nevertheless, the FTC ultimately approved the merger with the divestiture of only those four stores. (Pl's Ex. # 6).

A meeting to address all these issues was held in July between representatives from the PRDOJ and Wal–Mart, and by the beginning of August it was Plaintiffs' understanding that an agreement had been reached with the PRDOJ. These issues were the subject of a Voluntary Assurance Letter ("VAL") that the PRDOJ had demanded from Plaintiffs.

### Summer 2002—Voluntary Assurance Letter

The issue of the Voluntary Assurance Letter came up in early May 9, 2002, after receipt of the white paper, when the PRDOJ asked Plaintiffs to provide a letter addressing Wal–Mart's intentions as to certain aspects of its business in Puerto Rico. The request for Plaintiffs' intentions quickly shifted to the imposition of certain conditions on them that had been conceived by the PRDOJ pursuant exclusively to the public policy of the current administration of the Commonwealth of Puerto Rico.

On June 4, 2002 a proposed text of the VAL was sent by Plaintiffs' counsel to the PRDOJ. At that point, the subject of this letter contemplated the issue of the amount of purchases from Puerto Rico domiciled suppliers. Months later, this became one of the three conditions for approval of the merger to which Plaintiffs resisted, and the controversy ultimately led to the filing of the complaint in state court. In the early conversations on this topic between Plaintiffs and the PRDOJ, the PRDOJ requested a commitment from Plaintiffs to maintain a percentage of purchases from local suppliers as opposed to foreign based suppliers. In response to the June 4, 2002 letter from Wal–Mart, the PRDOJ sent Plaintiffs a letter on June 20, 2002 asking that it address and/or clarify certain issues in that letter. Specifically, the PRDOJ asked for more precise assurances with regards to the local purchases. (Pl.'s Ex. # 15). In good faith, Wal–Mart informed the PRDOJ that since 1999 it had substantially increased its local purchases in the Island and it intended to sustain that tendency. Soon thereafter, this issue was put aside and it was Wal–Mart's understanding that it had reached a general agreement with the PRDOJ. In addition, Plaintiffs were required to assure the PRDOJ that they would submit certain sales reports, as well as copies of Wal–Mart's contracts with local and foreign distributors, and any termination contracts

with distributors for a five year period following the transaction. Whatever the parties agreed in this regard would be set out in the VAL.

On July 1, 2002, attorney for Plaintiffs, Armando Lloréns ("Lloréns"), and Schmidt met with Martínez with the intent of reaching a final agreement for the VAL. After the meeting, four issues remained pending between the parties: first, the length of the reporting period; second, the format of the reporting; third, the PRDOJ's request for copies of Wal–Mart's past contracts with local suppliers; and finally, Wal–Mart wanted to ensure that these requests for assurances were not interpreted as its own failure to comply with similar information requests in the past.

A follow-up letter was then sent by Martínez to Plaintiffs on August 5, 2002. Martínez states in it that Defendant has given her approval, or given her "good to go" approval, to the VAL, which at that point was entitled "Proposed text of letter to P.R. Department of Justice—on Wal–Mart letter head" (Pl.'s Ex. # 16). In the second paragraph of the letter, Martínez asks for a trivial change in the language of the document: the word *"expects"* was to be substituted for the word *"intends* to continue these local purchasing policies and practices..."* The message conveyed in this letter was that but for the change of the word *expects* to the word *intends,* the rest of the proposed VAL would remain unaltered and once this change was implemented, a final agreement between the parties would be reached. The first paragraph of that VAL states: "Wal–Mart Stores, Inc, is pleased that *the Puerto Rico Department of Justice and the Federal Trade Commission are in agreement regarding the appropriate relief for resolving the competition issues* relating to Wal–Mart's proposed acquisition of the Su-

permercados Amigos supermarket chain." (Pl.'s Ex. # 14) (emphasis ours). Moreover, the first sentence of the last paragraph states: "We trust that Wal–Mart's voluntary assurance regarding the above matters demonstrates and confirms Wal–Mart's commitment to be an integral part of the Puerto Rican economy and should *resolve any remaining issues not addressed in the FTC/DoJ proposed settlement." Id.* Wal–Mart's understanding upon receipt of this August 5, 2002 letter was that the merger transaction had the "green light" from the PRDOJ and that it signified the culmination of the issues that had originally emanated from, or after, the May 3rd white paper and had been negotiated throughout the summer.

The August 5, 2002 letter, read in the context of what had transpired up to that point between the parties, can only be understood to mean that the outstanding issues between the PRDOJ and Plaintiffs had been taken care of. Martínez himself testified that all the issues raised in the July 1, 2002 meeting were taken care of by August 5, 2002. Nevertheless, he added that what the letter meant was that there were no objections to the proposed text of the VAL at the time, and not that the language of the agreement had been approved with finality. No such clarification is found in the letter, however, or in any subsequent clarifying correspondence sent to Plaintiffs.

Meanwhile, on or around July 3, 2002, another meeting took place between Amigo representatives and the PRDOJ. This time Lausell and José Revuelta ("Revuelta"), President of Supermercados Amigo, Inc., informed Martínez about the group emerging to buy the divestiture supermarkets in Cidra, Ponce, Manatí, and Vega Baja pursuant to the FTC's expectations. In light of this new development, Lausell once again offered to provide the OMA

with any information that was needed for the investigation of the transactions and for the agreements.

### August 2002—September 2002—The Divestiture

After talks between all parties about the buyer that had shown the most interest in the four divestiture stores, on August 20, 2002 a letter of intent on behalf of NewCo Food Retailing, Inc. was sent by Lausell to Revuelta expressing their interest in buying certain assets and retaining certain liabilities pertaining to the four Amigo stores. (Pl.'s Ex. # 3). The future buyers of these stores prepared a business plan and a capitalization plan under the name of NewCo Food Retailing, Inc.—NewCo for "new company"—but it was known to all that if they were approved, they would be incorporated under the name Supermercados Máximo.

As the "front buyers," a term used by the FTC to describe an identified and accepted buyer, as a condition to the FTC's approval Máximo had to produce other documents for the FTC, including its agreements with the landlords of the locales where the stores to be bought were located and information about its proposed management. After both the FTC and the PRDOJ had been provided with all available information regarding Máximo, conversations regarding the sale picked up steam towards the last week of August 2002.

On August 22, 2002 attorney for Plaintiffs, Fionna Schaeffer ("Schaeffer"), wrote to the FTC on behalf of her clients informing them, among other things, of the purchase price negotiated with the "Amigo shareholders" that were incorporating Máximo for the purchase of the four stores to be divested.[2] (Pl.'s Ex. # 4). Another letter, dated August 26, 2002, was also sent to both the FTC and the PRDOJ in response to a request for information made by the FTC. (Pl.'s Ex. # 5). Martínez testified that he had learned the "Amigo shareholders" would definitely be the divestiture buyers early in September 2002 and that even before that date, he had received information from Máximo, such as the capitalization, management, and business plans presented to the FTC. Even before August 2002 the PRDOJ had gained knowledge that the proposed divestiture buyers were associated with Amigo.

Supermercados Máximo was incorporated on September 17, 2002. (Pl.'s Id. # 31). On or around September 18, 2002 Schaeffer contacted Martínez to let him know that Wal-Mart was expecting to reach a final and formal settlement with the FTC within days. She wanted to know if he had any questions regarding the information sent about Máximo and was told by Martínez that the PRDOJ had no problem with Máximo. (Docket No. 21 at 201, lns. 20–22). Indeed, Martínez also told Schaeffer that on that same day, he had communicated to Defendant his recommendation of Máximo as the divestiture buyer. On that day, Martínez expressed his interest in expeditiously finalizing all the agreements with Plaintiffs since his wife was about to give birth. The agreements would in essence "mirror" those that were being entered into with the FTC. Schaeffer memorialized her conversation with Martínez in an electronic mail she sent George, as well as two of Plaintiffs' other attorneys, Lloréns and Jay Tabor. (Pls.' Ex. # 34) She communicated to them that from her conversation with Martínez she had learned that he had sent a favorable

---

**2.** The record reflects that at least two stockholders of Amigo, Steven Lausell ("Lausell") and William González ("González"), became stockholders of the company that the FTC approved to be the buyer of the four stores that were the issue of the divestiture.

recommendation to Defendant on Máximo, that he was creating an OMA consent decree that essentially mirrored the FTC's with minor modifications, and that OMA was clearly aware of the November 5, 2002 deadline to close on the merger agreement. The modifications Schaeffer and Martínez had talked about were in relation to the public comment period provided for in the FTC papers and the confidentiality of the consent documents with the PRDOJ.

Since Máximo was less creditworthy than Amigo, Wal–Mart had to pay the landlords of the locales of the four stores a sum of $5.4 million dollars to compensate for the loss of a more creditworthy tenant. Amigo shouldered $500,000.00 of that figure. The execution of the agreements with the landlords to this effect took place at some point before November 21, 2002 since it was a requirement for the FTC's approval of the merger.

### October 2002—The Legislative Hearings

The month of October was a turning point in many aspects of the investigations and negotiations that were taking place in reference to the Wal–Mart/Amigo merger. During the final days of that month, the Legislature of the Commonwealth of Puerto Rico held hearings regarding the merger in which representative of both Wal–Mart and Amigo testified.[3] The pressure began to build up on Defendant. By this time, Defendant had received many letters, white papers, and personal visits of concerned parties expressing their support or opposition to the transaction. This public pressure that kept building up towards the end of the month, close to what initially had been the closing date of the transaction—November 5, 2002—was essentially what led to the new demands Defendant imposed on Wal–Mart. Moreover, the re-

view of the transaction by the PRDOJ became a public policy decision subject to the input from various functionaries in the administration. Among these other functionaries were Ramón Cantero Frau, Secretary of Economic Development and Commerce, Cesar Miranda, Chief of Staff, and the Governor of Puerto Rico herself, Sila María Calderón. Defendant testified that like other decisions that were made at the PRDOJ, this one had created much tension on her as head of that Department.

From October on, this tension affected the negotiations between the PRDOJ and the Plaintiffs, and these began to intensify. (Docket No. 25 at 375, ln. 24). It was around this time that the maintenance of the labor force and purchase levels issues were raised. Lausell testified that in his third and last meeting with the PRDOJ, which took place on October 2002, the impression he got from the PRDOJ was "totally different [from the other meetings] in the sense that there was a lot of pressures being put in [sic] the transaction and that they were worried about … how to find ways to satisfy all the parties…" (Docket No. 25 at 391, lns. 19–23). Also in that meeting the PRDOJ asked Lausell for his advice with regards to the issue of local purchases and Lausell explained that one potential problem he saw revolving around that issue was the impact on distributors and suppliers of knowing that Wal–Mart *had* to buy from them.

Towards the end of October, Martinez also participated in a conference call with Schmidt. They discussed the VAL that had been negotiated during the summer, and Martínez made mention of several things in that letter that would have to be renegotiated and changed. At that point Schmidt responded by stating that con-

---

**3.** Press Releases, House of Representatives of the Commonwealth of Puerto Rico, October 29–31, 2002, *available at* http://www.camara-depuertorico.org/octubre2002.html.

trary to what Martínez apparently was suggesting, he did not see any legal issues involved in the proposed changes to the VAL. To that, Martínez responded that the issues were no longer "legal," but instead a shift in their agenda had turned them into "political" issues. (Docket No. 21 at 111, ln.7). Wal–Mart associated this sudden swerve and the Defendant's new demands to the legislative hearings that took place in late October and the pressure that these exerted on the PRDOJ.

By this time in the negotiations, Defendant and the staff working for her on this matter began to solidify their ideas with regards to what they would bring to the bargaining table as an ultimatum for Plaintiffs. Before November 21, 2002, however, they had not raise any of these issues with the heightened concern they reflected after that date. On November 21, 2002 the FTC documents and agreements with Plaintiffs were signed suggesting that the merger transaction between Wal–Mart and Amigo and the mandated divestitures were in compliance with applicable federal laws.[4] From thereon, Defendant personally took a much more active role in the negotiations as she attempted to please all those who were pressuring her against approving the transaction.

### November 2002—Fairness Opinion & Labor Issues

One of the three major issues that Defendant identified as the basis to her filing of the state court complaint was her request for a "fairness opinion letter" from Plaintiffs. (See Pl.'s Exs. 19–20). The parties explored the possibility of obtaining such opinion letter from Santander Securities Corporation for a fee of $150,000.00. The PRDOJ was allegedly requesting a fairness opinion letter to evaluate the divestiture of the four Amigo

stores precisely because that divestiture had validated the merger for antitrust purposes. Defendant testified that she saw it as her duty to make sure the divestiture was done correctly, that it was not a sham, and that Máximo had the capacity to be a long term market competitor. (Docket No. 25 at 303, ln. 2). Moreover, she wanted proof that the merger was an arm's length transaction. It was Martínez' understanding that the fairness opinion letter would reveal the value of the transaction and whether it was real under its particular parameters. The OMA thought that in addition to all the information they had received regarding the divestiture to Máximo, the business, capitalization and management plans as well as the price paid and other documentation, they also needed a fairness opinion letter that would reveal the financial analysis sustaining the legality and legitimacy of the transaction.

Clearly, all these concerns had been resolved by the FTC under the appropriate and applicable divestiture guidelines which were lacking in the PRDOJ. Martínez had no evidence that the divestiture transaction was a sham. (Docket No. 25 at 315, lns. 4–7). He and the PRDOJ were concerned, however, because some investors of Supermercados Máximo were shareholders at Amigo. Yet, between August and September, Martínez had approved the transaction and communicated his approval to both Plaintiffs' counsel, Schaeffer, and also to Defendant.

The PRDOJ knew about the divestiture requirements since approximately May 2002. It knew the possible genesis of Máximo since July 3, 2002 and that it had been chosen as the divestiture buyer for the four stores since mid-August 2002. The PRDOJ became aware that the chosen divestiture buyer was Supermercados

---

4. *See supra* note 1.

Máximo in August 2002. (Docket No. 25 at 283, lns. 6–7). Nevertheless, the request for a fairness opinion letter was first informally talked about, and not necessarily brought to Plaintiffs' attention, in late October or beginning of November. It was brought by Defendant to the attention of one Plaintiffs' attorney, Samuel Céspedes, on November 24 or 25, around the time when they also brought up the issue with the definition of an arm's length transaction in the OMA proposed agreement. It became a heated point of interest around the same time that the labor force issue was brought up.

The PRDOJ requested that the divestitures be an arm's length transaction and unilaterally added a definition of that term to the agreements. Plaintiffs immediately objected to the late request and questioned the real reasons behind it, given that the PRDOJ had known since August 2002 that the proposed buyers were associated with Amigo. Moreover, a sale of this nature taking place under divestiture circumstances could not reflect fair market value because it is typically done within a short period of time and the value will be whatever best value is procurable within that short period of time. The PRDOJ recognized this particularity of the transaction. Nevertheless, Defendant claimed to have her doubts about the divestiture transaction and, specifically, how it affected the merger's adherence to Articles 2 (Transactions in restraint of trade), 4 (Monopolies), and 5 (Mergers and acquisition) of the Puerto Rico Anti–Monopoly Act.

*Expert Testimony Re: Fairness Opinion*

Plaintiffs presented two expert witnesses in the hearings. The first was Rafael F. Martínez Margarida, Managing Partner of the San Juan Office of PricewaterhouseCoopers, LLP. Mr. Martínez holds a Master in Business Administration from Columbia University Graduate Business School. He is a Certified Public Accountant, a Certified Management Consultant, and a Certified Valuation Analyst, among other professional certifications. The other expert witness was Gregory Scott Vistnes. Mr. Vistnes holds a doctoral degree in economics from Stanford University. He specializes in the field of industrial organization, which is the study of how firms compete and interact with each other. As part of his professional experience, he served for several years in the Department of Justice, where he ultimately served as the assistant chief in the economic regulatory section. He also worked in the FTC, where he occupied the position of deputy director for the FTC's Bureau of Economics for three years. The findings of fact in this section derive from the expert testimony of these two witnesses.

Once there was evidence on record that the PRDOJ recognized that due to the nature of the transaction, a divestiture purchase frequently resulted in a sale for a price that did not reflect fair market value, its request for a fairness opinion became highly suspicious. A fairness opinion letter is a professional opinion rendered usually by an investment banker or a certified valuation professional regarding the reasonableness of the price of a sale in the context of a particular financial transaction. The opinion is usually provided to assure either the seller or the buyer that a transaction is fair. In cases of mergers and acquisitions, the opinion is typically prepared to provide the shareholders of a company reasonable assurances that management and/or their representatives have appropriately discharged their fiduciary duties to them. A fairness opinion letter does not reveal whether a transaction is fictitious or not; that could possibly be achieved through due diligence. Moreover, a fairness opinion letter does not

address market issues or market protection. A business valuation of a comparable transaction in the market would best serve to determine whether a sale price is within the parameters of the real value in the market. A fairness opinion would not reveal either whether after a divestiture sale, the sold stores would represent competition to the acquiring company. (Docket No. 25 at 455–465). Finally, given the nature of this transaction and the structure of the deal, neither a fairness opinion letter nor any other type of financial evaluation would have been able to categorize it and evaluate it as an arm's length transaction. For purposes of a divestiture investigation, the FTC would find it useless and inappropriate to entertain a fairness opinion letter since a divestiture frequently involves assets forced to be sold in a short period of time under duress. Hence, they usually will be sold at a very low price and requesting adherence to fair market prices would be senseless.

### The Agreements

Final preparations of the FTC agreements were done during the Fall 2002 and a final version was ready by November 14, 2002. The agreements and orders were signed on November 21, 2002, and published in the Federal Register on November 27, 2002. (Pl.'s Ex. # 6). The FTC's approval of the merger was a requirement to close the transaction and its effect was to remove the Hard–Scott–Rodino waiting period. Against this background that included the FTC's approval of the merger, previous agreements reached and previous assurances exchanged between the PRDOJ and Plaintiffs, and recent and unexpected references to the issues of maintaining the current labor force and producing a fairness opinion letter, on November 22, 2002 the PRDOJ sent to the Plaintiffs the first of four sets of proposed agreements exchanged between the parties from

that date until December 5, 2002. (Pl.'s Exs. 27 (*November 22, 2002—PRDOJ to Plaintiffs*); 23 (*November 25, 2002—PRDOJ to Plaintiffs*); 17 (*December 4, 2002—PRDOJ to Plaintiffs*); and 18 (*December 5, 2002—Plaintiffs to PRDOJ*)). Some of the documents included in these exchanges were very similar to the FTC documents. (Pl.'s Ex. 6).

On November 27, 2002, Defendant issued a press release containing statements that had been made by her on the preceding Sunday, November 24, 2002. She reiterated a list of the most important requirements the PRDOJ was using to evaluate the transaction. These were: 1) that Wal–Mart does not increase its concentration in local markets to an extent that reaches monopolistic levels; 2) that the divestiture of Amigo supermarkets is real and non-fictitious,; 3) that part-time jobs are as protected as full-time jobs are; 4) that sales of local agricultural products are not adversely affected; and 5) that the price paid for the four stores is within the parameters of the real market value for a transaction of this nature.

During the two weeks following the Secretary's press statements, the parties negotiated regarding the issue of the fairness opinion letter, the changes the PRDOJ had made to the VAL, and other language problems in the agreements regarding the affected geographical areas, the definition of arm's length transaction, and the demand that Plaintiffs maintain the current labor force and the current level of purchases from local suppliers.

### Maintenance of Levels of Local Purchases

The final versions of the proposed agreement that Plaintiffs received from the PRDOJ had the following provision: "... the respondents will not reduce or

suspend its current volume purchases of local agricultural and/or food products." (*See* Pl.'s Exs. 17, 23 & 27, *cf.* Pl.'s Ex. 18). With regards to this language the parties were not able to reach an agreement before the deadline for the closing. Wal–Mart was willing to make a commitment to buy as much locally as they could and they provided the PRDOJ with evidence that their purchases had in fact increased in recent years. But there was additional language in the agreement suggesting that these intentions were not enough and that Plaintiffs would subject themselves to legal enforcement if they were ever to reduce their volume of local purchases regardless of the reasons for such decision. This was unacceptable to Plaintiffs because it put them at a disadvantage with competitors who freely conducted their business while knowing Wal–Mart had these restrictions.

### Maintenance of Current Work Force vs. Maintenance of Current Work Force Levels

The issue of guaranteeing the maintenance of the current work force versus the current *levels* of work force was brought up in late November as an amendment to the VAL in an attempt by the PRDOJ to protect the public policy of Puerto Rico. Indeed, the protection and preservation of existing jobs, as well as the creation of new ones, is the highest priority of the current administration. (Pl.'s Ex. 19 at 2). Within the framework of this policy, Defendant brought up the need to either require or negotiate with Wal–Mart the issue of maintaining the labor force at the time of the acquisition. With regards to labor issues, the new VAL included a provision that read: "Wal–Mart will continue to comply with all applicable labor laws and regulations and will not undergo a reduc-

tion of the current labor force of Supermercados Amigo nor will substitute its full time employees for part timers as a result of the transaction." (Pl.'s Ex. 17).[5]

The controversy in the language of the agreements with regards to labor issue can be best summarized as follows: while the PRDOJ wanted to get Wal–Mart to agree not to alter the current labor force, that is, the employees that are currently working at the Amigo stores, Wal–Mart was willing to agree to maintain the current number of employees, leaving open the possibility that current employees could be terminated as long as their positions were not eliminated. (Docket No. 25 at 362, lns. 6–14). But despite their lack of intention to downsize their current work force, Plaintiffs could not agree to maintain the current employees and forego the possibility of ever letting go of anyone who currently works at Amigo. Wal–Mart anticipated that just like in any other acquisition, there was a possibility that the integration process would reveal deficiencies in the labor force that would need to be remedied. Moreover, no layoffs in the stores were anticipated, but Wal–Mart could not make the same commitment with regards to positions in their administrative and home offices. The phenomenon of attrition, over which they have no control, was also raised as a concern for Wal–Mart. Finally, as with the levels of purchase condition, Wal–Mart would be at a disadvantaged with competitors if forced to maintain the current labor work force.

### December 2002—Closing, Press Release, and State Lawsuit

Plaintiffs negotiated in good faith the conditions which Defendant was attempting to impose on them and even on December 5, 2002, Plaintiffs were hoping to reach an agreement with the Secretary of Justice

---

**5.** *See infra* at 413–414.

with regards to the terms of the VAL. The merger agreement originally had a deadline for closing the transaction on November 5, 2002, which was then extended to December 5, 2002, pending the Agreement and Order from the FTC. The Department of Justice was well aware of the closing date. Mr. Schmidt had personally assured Díaz–Tejeda, Director of the Office of Monopolistic Affairs, that the closing would take place on December 5, 2002.

A telephone conversation was held between Lausell and the Defendant on December 3, 2002. On the basis of all the pressure she had and her sense that it was "very very very" likely that they would reach an agreement with Wal–Mart, she asked Lausell if they could postpone the closing until Friday, December 6, 2002. Lausell communicated to her that he was of the impression that Wal–Mart did not feel the same way about the likelihood of reaching an agreement, since there were still important issues to be resolved. At this point, it seemed that the most important and controversial pending issue was the fairness opinion letter. Still, Lausell offered to assist in mediating with Wal–Mart to reach an agreement regarding the language of that letter so Defendant could take it to Cantero Frau for his approval, even though Lausell understood that Cantero Frau inevitably would remain firmly opposed to the transaction. Defendant's reaction to this last remark suggested that Lausell's suspicions about Cantero Frau were correct. (Docket No. 25 at 402 lns. 19–20).

While Defendant asked Lausell for two more days to "negotiate," at some point before December 5, 2002, she had ordered that a draft of a complaint be prepared. The idea of a potential lawsuit, or "going to court," had been brought up once or twice during the final days of negotiations. Plaintiffs, however, were quite certain that they would be able to reach an agreement with Defendant with regards to the VAL. The public announcement made by the Defendant on Thursday, December 5, 2002, at 3:00 P.M., with regards to the filing of a lawsuit in state court came as an enormous surprise to Plaintiffs.

The closing took place on the morning hours of Thursday, December 5, 2002. On that day, Díaz–Tejeda asked Plaintiffs' attorneys to postpone the announcement of the closing until 3:00 p.m. that afternoon so that Defendant could make an announcement first.[6] Plaintiffs acceded.

In the press release issued by Defendant on December 5, 2002, and attached as Exhibit A to Plaintiffs' complaint, Defendant expressed her intent to file a lawsuit against Plaintiffs. She explained that the transaction that took place on that same date between Wal–Mart and Amigo violated the Puerto Rico Anti–Monopoly Act and was contrary to the best interests of consumers, merchants and distributors in Puerto Rico. (Docket No. 1, Ex. A). Immediately thereafter, Defendant explained in the press release that Plaintiffs failed to consent to three issues that were essential for her to accept the transaction. The three conditions that Plaintiffs refused to agree to and Defendant had announced were the basis for her intent to ask a Court to enjoin the merger were: first, that the number of employees currently working at Amigo must remain at the current level; second, that at a minimum the purchase of local agricultural products must remain at current levels; and finally, that the transaction must be made in good

---

**6.** That announcement turned out to be the press release in which she stated that she would file a lawsuit against Plaintiffs in a few

hours because they refused to submit to her demands.

faith in order to protect the local market. Martínez testified that his understanding of the press release was that because Wal–Mart had not complied with the PRDOJ's labor force requirements, she would sue the parties to the merger. (Docket No. 25 at 329, ln. 25).

The state court complaint was filed by Defendant on December 6, 2002 at 2:36 p.m. and it only alleges violations of the Puerto Rico Anti–Monopoly Act. Together with the Complaint, Defendant filed a request for a preliminary injunction pursuant to Article 13 of Law 77. The injunction was granted that afternoon by the state judge. In the state court complaint, Defendant alleges for the first time that since May 2002 there existed antitrust concerns in another geographical area of the Island, the Municipality of Bayamón. However, two weeks earlier, on November 22, 2002, the PRDOJ had sent Plaintiffs a proposed draft of the agreements which included a provision that read: "[a]ll other relevant geographical markets of Puerto Rico [, besides Cayey–Cidra, Ponce–Juana Díaz, Barceloneta–Manatí–Vega Baja] do not evidence any overlaps among the parties, higher concentration indexes, conditions that would result in unacceptable concentrations of market power as a result of the acquisition or the evidence is that existing competition or the lack thereof will remain essentially unaltered." (Pl.'s Ex. 27 at 4, ¶ m). Three days later—and then again twelve days later—when the same documents were sent by the PRDOJ to Plaintiffs, that language had been taken out of Paragraph (m). Nevertheless, throughout the negotiating and in the agreements, reference to the problematic areas was always limited to the three geographical areas identified by the FTC in May 2002.

Even though the PRDOJ and Plaintiffs thought that they would be able to reach an agreement before closing the transaction, the turn the negotiations took in the last month made it impossible to reach an agreement in principle. Wal–Mart could not agree to maintain the current labor force, they could not agree to a definite percentage of purchases from local versus foreign-based suppliers, and neither would they produce what was an unnecessary opinion letter that would not help the PRDOJ in executing its duties pursuant to Puerto Rico's antitrust law.

## DISCUSSION

Before examining the probability of success on the merits of Plaintiffs' claims, we begin our discussion by setting forth what we glean from the findings of fact. In sum, we have identified a sequence of events from which we can discern that Defendant's December 6, 2002 complaint presents pretextual and bogus claims against the Plaintiffs. These claims disguise conduct and motivation of an inherently spurious nature lacking any kind of authoritative or legal support. Moreover, the Secretary's undertakings as the highest law enforcement agent of the Commonwealth elucidate a pattern of bad faith conduct in the negotiations, specially during the months of November and December, which violates Plaintiffs' civil rights under the United States Constitution. A brief review of the events that took place within the ten month period from February 5 to December 6, 2002 shows that after October, and even more strikingly after November 21, Defendant engaged in a desperate attempt to extract Plaintiffs' submissions to her imposed conditions as a result of public and political pressures put on her. These events culminated in the vindictive filing of a state antitrust lawsuit in an effort to coerce Plaintiffs to yield to the Secretary's demands.

We first look at the state court complaint and proceed backwards to February, 2002. The complaint alleges violations of the anti-monopolistic laws of Puerto Rico in two specific matters: that the geographical area of Bayamón created competition problems; and the allegedly fictitious divestiture of the four Amigo stores. Prior to the state court complaint, no mention was ever made of geographical areas that might raise antitrust concerns, other than the three areas identified by the FTC and remedied by the divestitures. Moreover, there is no evidence of any other independent investigation, or evidence gathered by Defendant in this regard, that would lead her to conclusions divergent from those reached by the FTC. Since May 2002, the FTC had approved the transaction pending the divestiture of the four stores. Plaintiffs successfully complied with this condition, thus gaining full FTC approval by November 21, 2002. Indeed, there was language in pre-November 25, 2002 drafts of the PRDOJ/Wal–Mart agreements that stated that no geographical areas—other than those where the four divestiture supermarkets were located—presented antitrust concerns. This language was taken out from the drafts on or around November 25, 2002. (*See* Pl.'s Exs. 23 and 27 at 4 ¶ m, *cf.* Pl.'s Ex. 17 at 4 ¶ m). In addition, all the drafts of agreements exchanged between November 22 and December 5, 2002 limited their discussion of the problematic geographical areas to Cayey–Cidra, Ponce–Juana Díaz, and Barceloneta–Manatí, Vega Baja—the three areas covered by the FTC's divestiture findings.

Aside from what the PRDOJ thought the fairness opinion would reveal, which the evidence suggested was an inaccurate and potentially feigned belief, absolutely no mention of other antitrust concerns was made prior to the December 5, 2002 press release. In her November 24, 2002 statements to the press, Defendant makes no reference to monopolistic or competition concerns raised by the transaction. Instead, the Secretary alleges that on the basis of the public policy of Puerto Rico, the scope of the OMA's investigation is broader than that of the federal agency. Therefore, she was examining other issues related to Amigo's labor force and Wal–Mart's purchases from local suppliers. This shows that prior to the fabricated monopolistic concerns that allegedly form the basis of Defendant's state court complaint, she had no legal substance on which to base that state lawsuit. Thus the real reason behind her bringing that action is unveiled: she is retaliating against Plaintiffs for not submitting to her public policy concerns, which were actually the concerns of those exerting pressure on her, and in doing so she abused her powers as a state actor to infringe upon the rights of the Plaintiffs guaranteed by the United States Constitution.

Defendant uses her counterfeit alibi, the fairness opinion letter, to justify the PRDOJ's inability to reach an agreement with Plaintiffs. Key to understanding the pretextual nature of this issue is that even though it was of utmost importance, to the point that there was a breakdown in the negotiations as a result of Plaintiffs failure to produce that letter, the PRDOJ did not raise the issue until after nine (9) months of negotiations, after six (6) months of knowledge of the divestiture, after four (4) months of knowledge of the identified buyers, *and* after the October legislative hearings which brought heavy political pressures on Defendant. The evidence showed that the PRDOJ had approved Máximo as the divestiture front buyer since September 2002 and was aware that this group of Amigo stockholders was interested in the four stores since early July 2002. No evidence was introduced to show why Defendant suspected the unfairness of the

divestiture sale nor was there any evidence of an investigation taking place to this effect. No evidence was introduced either of any genuine and true purpose that a fairness opinion would serve within the context of a divestiture. Indeed, the evidence revealed that there is no relation between the issues and concerns typically addressed in a fairness opinion and those addressed by the anti-monopolistic laws of Puerto Rico. But once again, the best revelation of the bogus nature of the request for this letter is the fact that it was not solicited from Plaintiffs until late November 2002, even though the identity and relationship of the Máximo group had been known more than four (4) months earlier.

Next, we consider the other two conditions, aside from the fairness opinion letter, that Defendant imposed on Plaintiffs during the last weeks of negotiations: 1) maintenance of current levels of local purchases, and 2) maintenance of the current labor force at Amigo stores. These were raised by Defendant as crucial matters that provoked her scrutiny of Plaintiffs' transaction for several weeks prior to its closing. Yet, Defendant attempts to suggest now that these two conditions in no way instigated her state court lawsuit or were related to it. She alleges that other monopolistic concerns, of which no evidence was introduced at the hearing, form the basis of her complaint, including those she sought to uncover in requesting a fairness opinion letter. This seems unreasonable and unconvincing given the pattern of events that has transpired in this case and the fact that up until the last day of negotiations and hours before filing the state court compliant, Defendant persevered in her demands for these two conditions. The Secretary's November 27 and December 5 press releases attest to this conclusion. (Pls.' Exs. 19 & 20).

Defendant admits that the labor and purchase requirements are unrelated to monopolistic and competition issues and, for this reason, they are not mentioned nor are they part of the state court lawsuit. If this is so, we wonder where she found the authority in the first place to demand these conditions. The Puerto Rico Anti–Monopoly Act does not provide the source for Defendant's imposition of conditions unrelated to antitrust concerns, even if they were—as they are not in this case—legal and constitutional. Additionally, the evidence showed that in no other merger monitored by the OMA had there been demands for maintenance of the current workforce and current local purchases, nor had there ever been requests for fairness opinion letters.

The Defendant testified that the imposition of the two conditions of local purchases and labor work force was done in the spirit of a negotiation and pursuant to the public policy of the Commonwealth of Puerto Rico. Given that this Court understands these conditions to be unconstitutional in that they violate Plaintiffs equal protection and commerce clause rights,[7] we pause to address the implications of Defendant's proposition. The Secretary claimed that just like any negotiator, she sat at the bargaining table in an attempt to leave that table with the best deal for those whose interests she was representing. It is absurd, however, to make such comparison when it is the State Attorney General demanding that a party not only relinquishes its constitutional rights but in addition, violates the law. If a private party made such demands at a negotiating table, the party receiving the demands would obviously feel less bulldozed than when they are made by a state official,

---

**7.** *See infra* at 414, 416 – 418.

who moreover has to pass muster over the transaction.

Those who negotiated on behalf of the PRDOJ, namely Martínez, Díaz Tejeda and the Secretary herself, believed that once they invoked the public policy of the administration, and because they were assuming the roles of negotiators in their dealings with Plaintiffs, they were at liberty to engage in an unobstructed pursuit of potentially illegal concessions for the good of the people of the Commonwealth of Puerto Rico. Thus, they could get away with imposing those demands first because they were "simply negotiators" and second, because ultimately they found their support in the public policy of the Commonwealth of Puerto Rico. This, they thought, would get them around the unconstitutionality of the conditions.

The public policy of Puerto Rico does not equate a *carte blanche* to government officials to impose illegal or unconstitutional conditions on parties entering a private transaction, nor to demand their acquiescence to those conditions. Much less can a state's protection of its public policy go so far as to violate the federal constitution and other state laws, nor can it be used to amend by fiat existing laws. Moreover, it seems very convenient to focus on those public policy concerns that are apparent and not go beyond the face of those imposed conditions to unveil adverse public policy effects that result from their imposition. Defendant suggested in her various press releases that the people of Puerto Rico would be negatively affected by the merger of Wal–Mart and Amigo since there was no guarantee that they would buy the same level of merchandise and agricultural goods from local suppliers and distributors as Amigo had in the past. But Wal–Mart understood that these requests were not only unfair but contrary to the interest of the people of Puerto Rico.

Knowledge of imposed quotas on Wal–Mart would limit its bargaining power with suppliers, who would end up selling goods at higher prices in light of the quotas, and that increment would have to be passed on to consumers, of course, the people of Puerto Rico.

Moving on to the other condition, Defendant alleges that in a negotiating spirit and in an effort to uphold her administration's primary public policy goal, the protection and creation of jobs, she conditioned her approval of the transaction on Plaintiffs's assurances that they would retain Amigo's current workforce. The Secretary's genuine interest in protecting employment, however, becomes suspect when we consider that she did not raise this issue until the last month of negotiations, *and* after the legislative hearings took place, when things became "political." (*See* Docket No. 26). The possibility of job reductions and changes in the work force existed since day one of the negotiations. Ever since Martínez became involved in the negotiations back in February 2002, the PRDOJ and OMA had every reason to know that the work force in the company that was being acquired could be affected. Yet, being as important as it is for the current administration, neither Defendant nor those working under her command, thought about it or brought it up until less than a month before the closing of the transaction. To be more precise, it was not until the third week of November that this requirement was presented to Plaintiffs. This absolutely shows the pretextual nature of the claims raised in the state court complaint. Once Defendant could not find any other way to delay and halt the merger pursuant to the anti-monopolistic concerns that she is entitled to protect, she tried to use as last resort the public policy of Puerto Rico.

Pursuant to the language she was attempting to get Plaintiffs to agree to, they would not be able to discharge any employees who currently make up Amigo's work force. Besides the bogus nature of this condition, we find that it moreover violates Plaintiffs' rights to equal protection of the law. Plaintiffs are entitled to be free from state prosecution if they adhere to the established labor laws. But through these labor conditions Defendant is effectively imposing additional restrictions on Plaintiffs as to when they can or cannot discharge an employee. If they are unwilling to accede to these restrictions, then their merger transaction will not be approved and cannot take place.

Under the labor laws of Puerto Rico, there are enumerated reasons that will constitute good cause for an employer to terminate an employee. Puerto Rico Law on Unjustified Dismissals, Law 80 of May 30, 1976, 29 P.R. Laws Ann. tit. 29, §§ 185a–185k ("Law 80"). Specifically, Law 80 sets out six (6) situations where good cause can be found for discharge of employees. 29 P.R. Laws. Ann. § 185(b). Nowhere in these provisions is it suggested that in cases of mergers and acquisition when the acquiring company is a foreign company, it will be forbidden from discharging employees or will ever be required to maintain its number of employees at the pre-merger level. Defendant attempts to amend the law to this effect as it applies to Plaintiffs.

One of the good cause reasons for discharge is the "*[t]echnological or reorganization changes* as well as changes of style, design or the nature of the product made or handled by the establishment, and changes in the services rendered to the public." 29 P.R. Laws Ann. § 185(e). Clearly, a merger entails changes of this type. The integration process of two companies requires that they reorganize management and administration and with this, it is very possible that employees at both lower and higher levels of management and service, have to be either transferred to different positions or discharged.

Law 80 contains a specific provision related to merger and acquisitions:

"in the case of transfer of a going business, *if the new acquirer continues to use the services of the employees who were working with the former owner,* such employees shall be credited with the time they have worked in the basis under former owners. In the event that the new acquirer *chooses not to continue with the services of all or any of the employees* and hence does not become their employer, the former employer shall be liable for the compensation provided herein, and the purchaser shall retain the corresponding amount from the selling price stipulated with respect to the business. *In case he discharges them without good cause after the transfer,* the new owner shall be liable for any benefit which may accrue under sections 185a–185l of this title to the employee laid off, there being established also a lien on the business sold, to answer for the amount of the claim."

29 P.R. Laws. Ann. § 185f (emphasis ours).

Clearly, this section of the law does not say that employees of a company being acquired cannot be discharged nor does it say that the new acquirer should bring in all new employees to substitute the old ones. Indeed, it does allow the possibility that none of the employees at the company being acquired are retained by the new acquirer. As the evidence showed, this was never Plaintiffs' intent. In imposing on Plaintiffs the condition of retaining the current labor work force, and thus, effectively amending Law 80 by executive fiat, Defendant not only violates constitutional

rights to equal protection of the laws but, moreover, reveals her desperate attempt to indulge all those who were exerting political and public pressures on her. Since no evidence was introduced to the effect that similar requirements are ever imposed on other companies, whether under the circumstances of a merger or not, Plaintiffs' equal protection rights are implicated. Defendant is imposing requirements on Plaintiffs that go beyond what the law requires, while not imposing them on others similarly situated.

With this factual and analytical background in mind, we proceed to examine Plaintiffs' claims within the framework of a preliminary injunction standard.

### *Preliminary Injunction Standard*

■ There are four elements necessary to grant injunctive relief: 1) there must be a substantial likelihood of success on the merits; 2) the preliminary injunction must be necessary to prevent irreparable injury; 3) the threatened harm must outweigh the harm a preliminary injunction would inflict on the nonmovant; and 4) the preliminary injunction would serve the public interest. *New Comm Wireless Services., Inc. v. SprintCom, Inc.,* 287 F.3d 1, 8–9 (1st Cir. 2002); *Narragansett v. Guilbert,* 934 F.2d 4, 5 (1st Cir.1991) *see also* FED.R.CIV.P. 65. "The *sine qua non* of that formulation is whether the plaintiffs are likely to succeed on the merits." *Weaver v. Henderson,* 984 F.2d 11, 12 (1st Cir.1993).

### *Likelihood of Success on the Merits*

■ In this Section 1983 action, Plaintiffs allege that Defendant's imposition of certain conditions on them before approving their transaction violates their civil rights to equal protection of the laws and due process as protected by the Fifth and Fourteenth Amendment to the Constitution of the United States of America, and also rights deriving from the Commerce Clause of the U.S. Constitution.

A review of the applicable constitutional analysis suggests that Plaintiffs would likely succeed on the merits of their constitutional claims.

### *Conclusions of Law*
### Commerce Clause Claim

■ Aside from its role as a "power-allocating provision giving Congress pre-emptive authority over the regulation of interstate commerce," the commerce clause also serves as a "substantive 'restriction on permissible state regulation' of interstate commerce." *Dennis v. Higgins,* 498 U.S. 439, 447, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991). Under this "negative command, known as the dormant Commerce Clause," states are prohibited "from acting in a manner that burdens the flow of interstate commerce." *Pharm. Research & Mfrs. of Am. v. Concannon,* 249 F.3d 66, 79 (1st Cir.2001). Thus, when a state statute "discriminates against interstate commerce," courts scrutinize such actions under a "virtually per se invalid rule." *Id.* These statutes are "routinely struck down," unless the state can show a "legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 274, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988); *accord Concannon,* 249 F.3d at 79.

■ Statutes pursuing "simple protectionism" are subject to this per se rule of invalidity, *see City of Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). Economic protectionism can be proved by showing that either in its effects or purpose, a statute implements differential treatment between in-state and out-of-state commercial entities. Thus, the Commerce Clause forbids states from benefitting "in-state economic inter-

ests by burdening out-of-state competitors," *Limbach,* 486 U.S. at 273–74, 108 S.Ct. 1803, or from building up their " 'domestic commerce by means of unequal and oppressive burdens upon the industry and the business of other States,' " *Bacchus Imps., Ltd. v. Dias,* 468 U.S. 263, 273, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) (citing *Guy v. Baltimore,* 100 U.S. 434, 443, 25 L.Ed. 743 (1879)). When facing such economic protectionism, the standards for proving a legitimate local purpose are onerous. *See Limbach,* 486 U.S. at 273–74, 108 S.Ct. 1803.

■ The Commerce Clause, however, is not merely a grant of authority to Congress. The Supreme Court has declared that the Commerce Clause "was intended to benefit those who ... are engaged in interstate commerce." *Dennis,* 498 U.S. at 449, 111 S.Ct. 865 (citing *Morgan v. Com. of Virginia,* 328 U.S. 373, 376–77, 66 S.Ct. 1050, 90 L.Ed. 1317 (1946)). The Court believes that "[e]very consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any." *Id.* at 450, 111 S.Ct. 865 (citing *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 539, 69 S.Ct. 657, 93 L.Ed. 865 (1949)). Thus, the Supreme Court has recognized that plaintiffs as market participants indeed have a cause of action under 42 U.S.C. § 1983 for violations under the Commerce Clause. *Dennis,* 498 U.S. at 446, 111 S.Ct. 865.

■ The requirement that Wal–Mart maintain a high level of purchases from local suppliers, distributors and manufacturers, present throughout the negotiations between Wal–Mart and the PRDOJ since May 2002 until the day before the state complaint was filed, falls within the type of protectionist state policies subject to the "virtually invalid per se rule" and thus it is "likely to be struck down." [8] In both its effect and purpose, the requirement differentiates between local Puerto Rico growers and out-of-state producers by mandating a quota of local products to be purchased annually. This differential treatment favors the interests of Puerto Rico growers, who are given a guaranteed market for the products sheltered from the usual perils of the market, while shutting out out-of-state growers from the potentially lucrative business relationship with Wal–Mart. Regardless of the quality of their products, the consistency of their supply, or the prices they offer, local growers would have a guaranteed and insurmountable advantage over out-of-state growers. This, in part, violates Wal–Mart's right to engage in interstate commerce, which is now reduced to "exclusivity contracts" with local growers, despite the myriad alternatives in interstate commerce.

In the face of this direct and discriminatory interference with interstate commerce, the Secretary of Justice offers no legitimate purpose. As has been suggested throughout this opinion, she invokes the public policy of the administration she currently works with as her source of authority that allows her to make these demands from Plaintiffs during their negotiations. She stated in a press release that "the public policy is directed at protecting the necessary balance that should exist between Puerto Rican and foreign capital and the benefits that it entails for the consumers." (Pl.'s Ex. # 19). Whether or not Wal–Mart *should* attempt to strike that balance is not for this Court nor any other to determine for as long as it en-

---

8. Puerto Rico is subject "to the constraints of the dormant commerce clause doctrine in the same fashion as the states." *Trailer Marine* *Transp. Corp. v. Rivera Vazquez,* 977 F.2d 1 (1st Cir.1992); *Starlight Sugar, Inc. v. Soto,* 253 F.3d 137, 142 (1st Cir.2001).

gages as a free market participant within the boundaries of the law, it is to make its own business decisions without governmental interference. But confronted with facially discriminatory remarks such as this one, we can and do determine that the Secretary is engaging in state protectionism prohibited by the federal constitution.

Defendant herself admits that failing to submit to her conditions with regards to the maintenance of a high level of local purchases is not contrary to either local or federal laws. Therefore, there can only be one conclusion as to the motivation of Defendant in making such requests from Plaintiffs: she was engaging in the type of protectionism of local suppliers that is forbidden under the Commerce Clause. Moreover, the state interests Defendant claimed to be upholding in imposing the preferential conditions on Plaintiffs do not result as beneficial to the people of Puerto Rico as she suggests and in fact, could result in quasi-monopolies in sectors where there is only one local supplier, distributor or manufacturer of any given good. Knowing that Wal–Mart had to purchase all its goods from them, suppliers would increase prices and in effect cause Wal–Mart to be at a great disadvantage when doing business and bargaining with these suppliers. This would ultimately result in a guaranteed loss for consumers, whose interests should no doubt also be taken into account by the public policy of the Commonwealth of Puerto Rico. In addition, the antitrust laws which Defendant invokes as her source of authority to interfere in Plaintiffs' transaction are intended to protect competition and *not* competitors, or suppliers, distributors and manufacturers for that matter. *Brooke Group, Ltd. v. Brown & Williamson,* 509 U.S. 209, 224, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).

Protectionism itself, or promoting instate business by discriminating against out-of-state participants, is not a legitimate state interest. *Starlight Sugar, Inc. v. Soto,* 909 F.Supp. 853, 858 (D.P.R.1995). Because the Department of Justice's requirement, as a direct and discriminatory interference with interstate commerce, is subject to the "virtually invalid per se rule" and since the Secretary of Justice could offer no legitimate local purpose to justify such a protectionist measure, the Plaintiffs are likely to succeed in the merits of this claim.

### Selective Enforcement Claim

The Equal Protection Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *see also* U.S. Const. amend. XIV, § 1. This protection is afforded "to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or *by its improper execution through duly constituted agents.*" *Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923) (citing *Sunday Lake Iron Co. v. Wakefield Tp.,* 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154 (1918))(emphasis ours).

The Supreme Court has recognized "successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). In that case, the Village of Willowbrook "intentionally demanded a 33–foot easement as a condition of connecting her property to the munici-

pal water supply," although Village regulations required the grant of only a 15–foot easement. *Id.* at 565, 120 S.Ct. 1073. The Court concluded that the allegations of arbitrariness and irrationality were sufficient to "state a claim under traditional equal protection analysis," even though after opposition from the Plaintiff, the Village retracted its requirement of a 33–foot easement. *Id.* at 564, 120 S.Ct. 1073.

■ Circuits courts expanded and developed this "selective enforcement" cause of action. Selective prosecution or enforcement is actionable under the federal Constitution "where the decision to prosecute is made either in retaliation for the exercise of a constitutional right ... or because of membership in a vulnerable group." *Torres v. Frias,* 68 F.Supp.2d 935, 942 (N.D.Ill.1999)(quoting *Esmail v. Macrane,* 53 F.3d 176, 179 (7th Cir.1995)). Liability has been imposed in these cases upon plaintiffs' proof that (1) "compared with others similarly situated," they were "selectively treated"; and (2) that the selective treatment "was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights or bad faith intent to injure a person." *Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectmen,* 932 F.2d 89, 92 (1st Cir.1991); *accord Harlen Assocs. v. Village of Mineola,* 273 F.3d 494, 499 (2d Cir.2001); *Hilton v. Wheeling,* 209 F.3d 1005, 1008 (7th Cir.2000). Absent an allegation of racial religious or speech discrimination, "there must be evidence from which a jury reasonably could find that the [defendant] acted with malicious or bad faith intent to injure [the plaintiff]." *Yerardi's,* 932 F.2d at 92. This cause of action has been specifically applied in Section 1983 claims. *See Harlen Assocs.,* 273 F.3d at 499; *Yerardi's,* 932 F.2d at 92. Because the plaintiff must prove illegitimate animus and malicious in-

tent, courts have recognized the onerous nature of this claim. *Olech v. Village of Willowbrook,* 160 F.3d 386, 388 (7th Cir. 1998); *Rubinovitz v. Rogato,* 60 F.3d 906, 911 (1st Cir.1995). Court have also stated, however, that the temporary nature of the oppression is unimportant in the analysis. *Olech,* 160 F.3d at 388.

The Supreme Court's analysis of the facts in *Willowbrook* sheds light on the effect of Defendant having technically "dropped" from her state court complaint the labor and purchase related conditions imposed on Plaintiffs while she was negotiating with them. The answer is that it does not matter. The Court in *Willowbrook* found plaintiff had a viable equal protection claim *regardless* of the fact that defendant there had "redeemed" itself when it retracted the particular and unusual demand from plaintiff of a 15–foot easement. 528 U.S. at 565, 120 S.Ct. 1073. Therefore, Defendant errs in suggesting that as long as she did not make the conditions part of her complaint she would be within the boundaries of the law in negotiating with Plaintiffs and demanding their submission to special conditions before she would approve their merger. Such belief in fact results in liability for equal protection violations.

The facts of this case reveal that Defendant has clearly engaged in treatment of Plaintiffs that intends to inhibit them from exercising *and* punishes their exercise of equal protection and due process rights as well as their rights under the Commerce Clause. Plaintiffs have a right to be free market participants without the arbitrary and oppressive imposition of obstacles that are unwarranted not only in fact but also under the law. Clearly the Secretary's intent in denying the OMA's approval of the merger on the basis of their failure to submit to her requests was to punish Plaintiffs for their defiance to her de-

mands. As has been well put by the Seventh Circuit, Defendant's action were motivated by a " 'spiteful effort to "get" [Plaintiffs] [ ] for reasons wholly unrelated to any legitimate state objective.' " *Olech v. Village of Willowbrook,* 160 F.3d 386, 386 (7th Cir.1998)(quoting *Esmail,* 53 F.3d at 180).

The evidence in this case also showed that Defendant had never before imposed conditions such as the ones demanded from Plaintiffs in this case. Moreover, never before had Defendant questioned a divestiture and demanded a $150,000 fairness opinion letter in order to convince herself of the legitimacy of any aspect of a merger and acquisition transaction.[9]

### Vindictive Enforcement Claim

■ Vindictive enforcement is the other equal protection claim available against invidious discrimination through the enforcement of valid statutes.[10] *See Futernick v. Sumpter Township,* 78 F.3d 1051, 1056 n. 7 (6th Cir.1996) (explaining that they distinguish two different types of selective prosecution claims under the Equal Protection Clause: "true selective prosecution" and "vindictive enforcement"). This cause of action has been recognized when administrative agencies enforce their rules as a punishment for, or a deterrent to, the exercise of constitutional rights. *See id.; see also Heaton v. City of Princeton,* 47 F.Supp.2d 841 (W.D.Ky.1997). As such, it is similar to the due process cause of action of vindictive prosecution in criminal cases. *See, e.g., United States v. Lanoue,* 137 F.3d 656, 664 (1st Cir.1998) ("Successful assertions of vindictive prosecution are most common where a defendant advances some procedural or constitutional right and is then punished for doing so."). The general inquiry in a vindictive prosecution claim analysis must be whether "as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for the hostility or punitive animus" towards defendants due to their exercise of constitutional rights. *United States v. P.H.E., Inc.,* 965 F.2d 848, 858 (10th Cir.1992)(quoting *United States v. Raymer,* 941 F.2d 1031, 1042 (10th Cir.1991)). "The analysis is directed to determine *how the decision to prosecute was actually made in the case under consideration.*" *P.H.E.,* 965 F.2d at 858 (emphasis ours).

**9.** Pursuant to FED. R. EVID. 201(b)(2), the Court hereby takes judicial notice of the fact that during Martinez and Defendant's tenure at the PRDOJ, at least three other mergers have taken place. First, the sale of Puerto Rico Cement Co. this past year to Cemex, S.A., a Mexican company. Also, V. Suarez & Co. acquired Cadierno Corp. in 2001. Finally, Grupo Gloria, a Peru-based company has recently signed an agreement with Dean Foods Co., parent company to Suiza Foods, to acquire all the operations of Suiza. This foreign capital acquisition of a local company that covers two-thirds of the local fresh-milk market, has not been under the scrutiny of the PRDOJ even though their agreement was signed in early November 2002, after the PRDOJ and the government became aware of potential public policy and political concerns that can ensue as a result of this type of transaction. No evidence was introduced with regards to the PRDOJ's oversight of any of these recent transactions. *See* José L. Carmona, *Ferre–Rangel: Decision to Sell Puerto Rican Cement Difficult,* Caribbean Business, Construction, June 20, 2002, *available at* http://prwow.com/html/cbarchive.asp; CB & WOW News, *V. Suárez Acquires Cadierno Corp.,* Caribbean Business, Retail, May 10, 2001, *available at* http://prwow.com/html/cbarchive.asp.; CB & WOW News, *Dean Foods signs agreement to sell Suiza to Grupo Gloria,* Caribbean Business, Retail, November 14, 2002, *available at* http://prwow.com/html/cbarchive.asp.

**10.** As has been evident throughout this discussion section, the claims raised in this case challenge the Secretary's pretextual enforcement of the Puerto Rico Anti–Monopoly Act, not validity of the statute itself.

To succeed in a vindictive enforcement claim a plaintiff must prove that (1) he or she exercised a protected right; (2) the prosecutor or state official had a stake in the exercise of that right; (3) the prosecutor's or state official's conduct was unreasonable; and (4) the prosecution or state enforcement "was initiated with the intent to punish the plaintiff for the exercise of the protected right." *Futernick,* 78 F.3d at 1056 n. 7.

Plaintiffs in this case are exercising their rights under the Commerce Clause to be market participants free from impositions of state protectionism. In refusing to abdicate them, Plaintiffs exercised their constitutional rights under the Commerce Clause. They did not yield to the Secretary's attempt to impose unconstitutional conditions on their transaction. The Secretary also violates Plaintiffs' right to equal protection under the law when she attempts to extract from them a consent decree that in effect amends the labor laws applicable to them as employers.

The Secretary had a stake in the Plaintiff's exercise of these rights because it meant that she would not be able to satisfy those who were exerting pressures on her to enjoin the merger transaction. She and her administration had a political stake in the transaction because while trying to give the impression that they were protecting the public policy and people of Puerto Rico they were gaining political support.

The Secretary's conduct towards Plaintiffs was, to say the least, unreasonable and also retaliatory and spiteful. The PRDOJ began demanding concessions from Plaintiffs in April 2002. Once Wal–Mart agreed to yield to one request, they would make another one and consequently come up with more and more requirements. In August 2002, Plaintiffs thought they had concluded their negotiations with

the PRDOJ. Yet, after October the Secretary began making certain demands under the guise of continuing negotiations. Suddenly, the agreed terms of the VAL were no longer acceptable to the PRDOJ. She once again wanted to make changes to the agreements that entailed onerous submissions on behalf of Plaintiffs and that evinced her retraction from previously agreed matters.

The evidence suggests that it was around the time when she began to get the most resistance from Plaintiffs, that the Secretary directed her staff to prepare the state court complaint. The PRDOJ received much resistance from Plaintiffs with regards to the demand for a fairness opinion letter and the requirement that Plaintiffs maintain Amigo's current labor force. As has been discussed at length above the request for a fairness opinion letter was absolutely unreasonable. *See supra* at 409 – 411. Moreover, the other two conditions which remained unresolved at the closing of the transaction were not only unreasonable but also unconstitutional. Defendant's irrationality in making such demands and attempting to justify them pursuant to the public policy of Puerto Rico is one of the many indications found in the facts of this case that leaves this Court no option but to conclude that these were synchronized actions taken as a result of Plaintiffs resistance to Defendant's extortion efforts. Since Plaintiffs were not acquiescing to Defendant's demands, she retracted her earlier approval of the VAL and of the divestiture areas so she could have pretextual justifications to file her complaint pursuant to the local anti-monopolistic laws.

There was a certain suspicious aspect present during the final stages of the negotiations when many obstacles were put on Plaintiffs' transaction. These were, amongst others, the late request for a

fairness opinion, the last minute amendments to an already agreed upon Voluntary Assurance Letter, the failure to mention at any point before filing the state court complaint any antitrust issues in geographical areas other than those that formed the basis for the FTC mandated divestitures, and the switch from legal to political concerns. Construed together, these series of developments reveal why those obstacles were imposed on Plaintiffs and suggests that Defendant's state lawsuit is a sham which seeks to further harass Plaintiffs and finds no support in any of the provisions of the local anti-monopolistic laws.

Soon after the PRDOJ's agenda shifted in the Fall of 2002 from a focus on legal issues to one on political issues, Defendant engaged in a desperate attempt to not only please everyone who was pressing her one way or the other, but to intimidate and coerce Plaintiffs into submissions that fall well beyond the scope of the anti-monopolistic laws of Puerto Rico. This represents a clear abuse of the judicial process and of state endowed powers that violate fundamental rights of Plaintiffs, who became targets simply because they would not yield to unconstitutional demands. The lawsuit filed in state court further burdens Plaintiffs with legal defense costs and threat of liability, and it also intimidates in trying to convince them to agree to the unconstitutional conditions to which, in Defendant's own words, they have not "submitted."

Ultimately, the case before this Court is not strictly about antitrust issues, or the commerce clause, or due process or equal protection. Instead, it is about a state official who has attempted to misuse and abuse state power to violate Plaintiffs' constitutional rights. "The purpose of § 1983 as well as the other Civil Rights provisions is to provide a federal remedy for the deprivation of federally guaranteed rights in order to enforce more perfectly federal limitations on unconstitutional state action." *Jobson v. Henne*, 355 F.2d 129, 133 (2nd Cir.1966).

### *Irreparable Harm*

■ The Court finds that without a preliminary injunction Wal–Mart would suffer irreparable harm in both economic and non-economic form. The injunctive relief sought by Defendant in the Puerto Rico courts does not seek to prevent a business transaction from taking place; rather, the Secretary seeks to reverse a transaction that has already taken place. Wal-mart would thus be forced to halt and/or reverse any cooperation or integration activity with Amigo it has begun so far. This potential course of action affects Wal–Mart in diverse ways. First, the delays and uncertainties affect employee morale and customer trust. Employee uneasiness after ten months of rumors about a impending merger would be heightened by a further, and potentially prolonged, delay. This uneasiness will likely permeate the delivery of the services to Amigo customers. In addition to the effect on employee morale and the delivery of services to customers, the Defendant's attempt to impede the transaction will surely damage Wal–Mart's reputation arising from the unlawful and bogus enforcement of the Puerto Rico antitrust laws. Wal–Mart has carefully built its reputation in the ten years it has conducted business in Puerto Rico, and that reputation—easier to lose than to rebuild—would erode slowly. Third, Amigo faces the potential loss of their current distribution center, the lease of which expires on March 2004. The merger between Amigo and Wal–Mart envisioned the use of a joint distribution center. With a prolonged halt in the integration of Wal–Mart and Amigo, however, the difficulties in establishing an independent distribution

center before the current lease expires jeopardizes Amigo's sustained operation.

■ The deprivation of Wal–Mart constitutional rights, however, is the utmost irreparable harm in this case. A presumption of irreparable harm flows from and is triggered by an alleged deprivation of constitutional rights. *See Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.1996); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984). If the Secretary's actions indeed violate Wal–Mart's constitutional rights, this deprivation must be stopped promptly. The unacceptable alternative is to subject Wal–Mart to an unlawful enforcement action, and once the deprivation of their constitutional rights has taken place, have this Court intervene. Having proper jurisdiction over this case, it is necessary to prevent the deprivation now, instead of trying to offer redress after the deprivation has taken its toll.

### The Public Interest

We live in a system of laws, not men. Thus, while the promotion of vigorous competition in the Puerto Rican economy is a legitimate public policy, it cannot belittle another unceasing public interest: guaranteeing the rule of law and preventing deprivations of constitutional and civil rights under color of law. To preserve the rule of law the government must act not only as an enforcer, but as a guiding light. For as Justice Brandeis once declared: "In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example." *See Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

The actions by the Department of Justice against Wal–Mart not only fall short of being a guiding light, they poison the trust that the people must have in its legal and political system. The government cannot hide under the guise of its legitimate enforcement authority to deprive the citizens of this Nation of their constitutional rights. Contrary to the Secretary's assertions, she is not just a negotiator seeking the best deal; she is a state actor and, more specifically, she represents the prosecutorial arm of the state with all its power and authority which in this case has been severely misused. When the prosecutorial arm of the state uses its power to coerce private parties into abdicating their constitutional right, not only is due process and equal protection of law denied, but the trust in our processes and system of laws diminishes. It is this public interest in guaranteeing due process and preserving the trust in the rule of law that the Court furthers with this preliminary injunction.

The parties that entered into this transaction recognized that the process would entail scrutiny by a federal and a state agency. The federal agency, fully capable as it is to review this type of transaction and having been instituted for that purpose, made a careful examination of the Wal–Mart/Amigo merger proposal and determined that it complied with federal antitrust laws from which the local laws minimally deviate. It is in the best interest of the people of Puerto Rico that under circumstances such as this one, where a federal and a state agency are conducting parallel investigations and one has more resources available to it than the other, their government recognizes with full faith and credit the decisions of a federal agency such as the FTC when there is no indication that such decision was incorrect or unjust. Moreover, it is also in the best interests of the people of Puerto Rico that their government refrain from engaging in arbitrary and irrational enforcement of the

laws, specially when these are used contrary to their own purposes.

### The Balance of Equities

Considering the Plaintiff's irreparable harm and the strong public interests in favor of supporting the status quo, the harm caused to the Defendant by the issuance of a preliminary injunction is less considerable than the harm to the Plaintiffs. First, the preliminary injunction does not prevent the Secretary of Justice from ultimately enforcing Puerto Rico's antitrust laws. It merely preserves the status quo to ensure that no deprivation of constitutional rights takes place. If the Secretary's actions are found lawful, she will be free to enforce the applicable laws and seek the remedies she deems appropriate. Second, there is no evidence that a mere delay in legal action in state court will cause disproportionate harm to the Secretary of Justice. As this Court suggested in an earlier opinion in this case, Defendant waited quite a long time, seven (7) months to be exact, before raising many of her "primary" and "fundamental" concerns with the Wal–Mart/Amigo transaction. If this Court were ultimately to decide in her favor, she will be able to accomplish the same results than she could in the very near future. The possibility of further divesting other stores if she was in fact correct about the remaining competition issues in other geographical areas, or of reselling those that were already divested will be as present then as it is now. The opportunity for Plaintiffs to vindicate their rights before going through a process that itself violates those rights will be long gone if not addressed in this lawsuit with the provision of preliminary injunctive relief.

### CONCLUSION

The above discussion demonstrates that Plaintiffs would likely prevail on their contention that unconstitutional conditions were demanded and requested by the Secretary of Justice in order to approve the acquisition of Supermercados Amigo, Inc. by Wal–Mart Puerto Rico, Inc and the divestiture of the four Amigo stores to Supermercados Máximo, Inc. Furthermore, the evidence before the Court leads the Court to conclude that the events that transpired from February 5 to December 5, 2002 show that Plaintiffs will suffer irreparable injury if the Secretary is not enjoined from continuing to prosecute the lawsuit filed in the Court of First Instance, Superior Division of San Juan against the Plaintiffs herein. Finally, consideration of the comparative equities in this case, including the public interest, weigh in favor of Plaintiffs.

Therefore, based on the findings entered herein and the special emphasis placed on the "likelihood of success" prong, as required by First Circuit case law, the Court rules in favor of Plaintiffs in their request for a preliminary injunction and the same is **GRANTED**.

Defendant Anabelle Rodríguez, Secretary of Justice of the Commonwealth of Puerto Rico, her lawyers, agents, employees, or any other person acting in concert with her is hereby enjoined, prohibited and/or forbidden to thwart, impede, or interfere with the acquisition of Supermercados Amigo, Inc. by Wal–Mart Puerto Rico, Inc. and the divestiture by Wal–Mart Puerto Rico, Inc. of four Amigo stores to Supermercados Máximo, Inc.; or to seek a stay in any court of the Commonwealth of Puerto Rico directed to the Plaintiffs to impede, interfere, or forbid them from operating the Supermercados Amigo stores as a wholly owned subsidiary of Wal–Mart Puerto Rico, Inc.

**IT SO ORDERED.**

**SO ORDERED.**