B & B COASTAL ENTERPRISES,
INC., Plaintiff

v.

Paul A. DEMERS, Kelly Wentworth,
Wayne Berry, Thomas Wellman, Jack
Libby, Daniel Boothby, and Town of
Kennebunk, Maine, Defendants

No. CIV. 03–05–P–C.

United States District Court,
D. Maine.

July 25, 2003.

Robert E. Mittel, Mittel, Asen, Hunter & Cary LLC, Portland, ME, Ronald R. Coles, Coles Law Office, Kennebunk, . Maya Alexandria, Wilmer, Cutler, & Pickering, Roger W. Yoerges, Wilmer, Cutler, & Pickering, Washington, DC, for B & B Coastal Enterprises Inc, Plaintiff.

Mark V. Franco, Thompson & Bowie, Portland, ME, for Paul A. Demers, Kelly Wentworth, Wayne Berry, Thomas Wellman, Jack Libby, Daniel Boothby, Kennebunk, Town of, Defendants.

## ORDER ON PLAINTIFF'S SECOND MOTION FOR PRELIMINARY INJUNCTION

GENE CARTER, Senior District Judge.

Now before the Court is Plaintiff B & B Coastal Enterprises, Inc.'s Second Motion for Preliminary Injunction with Incorporated Memorandum of Law ("Second Motion for Prelim. Inj.") (Docket Item No. 26). Plaintiff requests a preliminary injunction enjoining Defendants Town of Kennebunk and its agents from enforcing the Town's allegedly unconstitutional sign ordinance. Defendants object. *See* Objection to Plaintiff's Second Motion for a Preliminary Injunction with Incorporated Memorandum of Law ("Objection") (Docket Item No. 41). After careful review of the record before the Court, including the evidence established at an evidentiary hearing on July 18, 2003, the Court will deny Plaintiff's Second Motion for a Preliminary Injunction.

### I. FACTS

On July 25, 2002, Paul Demers, the Code Enforcement Officer for the Town of

Kennebunk and one of the named Defendants in this action, conducted a sign inspection on the premises of Bartley's Dockside Restaurant, owned by Plaintiff B & B Coastal Enterprises, Inc. ("B & B Coastal").[1] *See* Second Motion for Prelim. Inj. at 5. According to the testimony presented at the evidentiary hearing before the Court, Mr. Demers had begun receiving complaints as early as the spring or summer of 2000 about the number of signs Bartley's Dockside Restaurant displayed on its premises. Specifically, he received such complaints from the owner of a neighboring business, John Kingston, who owned a restaurant called the Clam Shack. Mr. Kingston felt that he himself was complying with the sign ordinance, and he wondered why Bartley's Dockside Restaurant continued to hang signs in excess of that allowed by the ordinance. Mr. Kingston complained again in June of 2001, and the Town of Kennebunk still did nothing. Finally, in the spring or summer of 2002, Mr. Kingston went above Mr. Demers and voiced his concerns with the Town Manager and the Town Clerk of Kennebunk, asserting that he wanted the Town to "lay down the law" as far as the sign ordinance was concerned. It was then that the Town directed Mr. Demers to do an inspection of the premises of Bartley's Dockside Restaurant, which Mr. Demers did, along with an inspection of other businesses in the area.[2]

Upon inspecting the premises of Bartley's Dockside, Mr. Demers informed Brian Bartley, the owner of Bartley's Dockside Restaurant and President of B & B Coastal, that his business was in violation of the sign ordinance. Exactly what was said by Mr. Demers to inform Mr. Bartley of the violation is a matter of significant dispute. Plaintiff alleges that Mr. Demers immediately focused on the outdoor umbrellas on the tables which bore the trademark "Hebrew National," pronouncing them "personally offensive" to him, stating that they "have to go," and adding, "Why can't you serve the same food as other restaurants?" Second Motion for Prelim. Inj. at 5; Declaration of Brian Bartley in Support of Plaintiff's Second Motion for Prelim. Inj. (Docket Item No. 27) ¶ 18. Plaintiff claims that Mr. Demers expressed concern only over the twelve umbrellas in front of the restaurant, all which, according to him, bore the "Hebrew National" logo. Plaintiff claims that when he asked Mr. Demers about the umbrellas on the other tables in the side/rear outdoor eating area, which bore the "Budweiser" trade-

---

1. Throughout this document the Court refers to Plaintiff as "Bartley's Dockside Restaurant," "B & B Coastal," "Bartley's" and "Mr. Bartley."

2. At the hearing, Mr. Demers plainly testified that the sign ordinance had not been vigorously enforced in the past because of the simple fact that signs were not his top priority as the Code Enforcement Officer; with other concerns such as building permits and other issues to monitor under the zoning ordinance, he had been too busy and lacked the resources to adequately enforce the sign ordinance up until then. According to Plaintiff, on the same day Mr. Demers conducted his inspection, the Town Selectmen of the neighboring town of Kennebunkport also voted to adopt a bus ordinance severely restricting access to the Town of Kennebunk. Given the negative ramifications that this bus ordinance would have on Plaintiff's heavily tourist-dependent business, Brian Bartley, the President of B & B Coastal, had devised a plan with other business leaders in the Town to permit buses to park in the boatyard behind Bartley's Dockside. *See* Second Motion for Prelim. Inj. at 5. According to Defendant Demers's testimony at the evidentiary hearing before the Court, the Town of Kennebunkport is a separate municipal entity from the Town of Kennebunk, and he had no knowledge of either the Town of Kennebunkport's impending bus ordinance, or of Mr. Bartley's opposition to it and his plan to subvert it.

marks, Mr. Demers stated that those umbrellas were "fine." *Id.* at 5–6.

In contrast, Defendant Demers contends that during his visit to Bartley's Dockside Restaurant on July 25, 2002, he spoke to Mr. Bartley about the sandwich boards, umbrellas, altered signs, and various other signs that were in violation of the ordinance. *See* Affidavit of Paul Demers (Docket Item No. 35) ¶ 12. At that time, Mr. Demers informed Mr. Bartley that his business was in violation of the sign ordinance, and advised him that he could retain the two existing signs on the face of the building if he applied for and received a permit. *See id.* Defendants deny that Mr. Demers ever described the "Hebrew National" umbrellas as being "personally offensive." Objection at 4; *see also* Demers Aff. ¶ 21. Defendants maintain that Mr. Demers did not single out the "Hebrew National" umbrellas in any way, because there were also "Poland Spring Water," "Red Hook," and "Shipyard Ale" umbrellas on site, all of which constituted advertisement signs under the ordinance. Objection at 4.[3] At the evidentiary hearing, Defendant Demers specifically stated that the twelve umbrellas in front of Bartley's Dockside Restaurant were *not* all "Hebrew National" umbrellas.

At that hearing, Defendants submitted photographs with date stamps indicating they were taken on July 25, 2002. The photographs show that the umbrellas in front of Bartley's Dockside Restaurant included umbrellas bearing "Shipyard Ale" and "Poland Spring" logos. *See* Defendant's Exhibit 12. Defendants assert that Mr. Demers informed Mr. Bartley that his umbrellas were considered advertisement signs as defined by the ordinance and that, if he wanted to keep them, they would have to be modified so that they would no longer be considered by the ordinance to be advertisement signs. *Id.*

The following day, July 26, 2002, Mr. Demers delivered a Notice of Violation/Order for Corrective Action to Mr. Bartley at Bartley's Dockside Restaurant, advising him that his business was in violation of Article 4, Section 1 of the Zoning Ordinance and ordering that the banners and non-permitted signs be removed that day. Second Motion for Prelim. Inj. at 6.[4] Plaintiff did not take corrective action that same day, but by August 19, 2002, had used spray paint to blot out the "Hebrew National" trademarks on the umbrellas. *Id.* at 6; Objection at 5.[5] However, according to Defendants, despite the removal of the "Hebrew National" trademarks, Plain-

---

3. An "advertisement sign" is defined by the ordinance as "[a] sign which directs attention to the type of business or profession conducted, as well as to a commodity or service, sold, offered, or manufactured, or to an entertainment offered on the premises where the sign is located." Ordinance, Art. 10, § 7(C)(3)(e).

4. Mr. Demers also later issued on August 8, 2002, a Notice of Violation against the Clam Shack and Shipyard, Inc. for non-compliance with the sign ordinance. *See* Exhibits G and H to Demers Aff. Both businesses corrected their sign violations without debate. *See* Demers Aff. ¶ 19; *see also* Defendant Exhibit 8. Testimony at the hearing and affidavits submitted as exhibits at the hearing indicate that Mr. Demers also gave verbal citations to many business owners, all of whom promptly complied with the sign ordinance upon such notice. *See* Defendant Exhibits 6, 7, 9, 10.

5. Mr. Demers contends that he also hand-delivered a letter to B & B Coastal at Bartley's Dockside Restaurant on August 8, 2002, advising the business that as of that day it had not complied with the Notice of Violation, and that Mr. Demers would be forwarding the matter to the Town Attorney to proceed with an enforcement action. *See* Exhibit J attached to Demers Affidavit. Mr. Bartley denies he ever received this letter. *See* Declaration of Brian Bartley in Support of Plaintiff's Second Motion for Preliminary Injunction (Docket Item No. 27) ¶ 43.

tiff continued to violate Section 7 of the Zoning Ordinance with an excessive number of non-permitted signs. Objection at 5.

On September 16, 2002, the Town Attorney filed an 80K Citation and Complaint with the York County District Court citing Plaintiff's failure to comply with the Town of Kennebunk sign ordinance by displaying signs without the required permits and exceeding the number of signs permitted on the site. *See* Second Motion for Prelim. Inj. at 6–7; *see also* Exhibit 5 to Bartley Declaration. On October 17, 2002, Mr. Demers advised the Town Manager of the 80K action and recommended that Plaintiff's liquor license application be withheld until the sign ordinance violations had been corrected. *See* Demers Affidavit ¶ 26. However, the 80K Complaint has been stayed pending the outcome of this suit, *see* Bartley Declaration ¶ 46. Nevertheless, Defendant maintains that Plaintiff remains in non-compliance with the Town's sign ordinance by continuing to display six more signs than are permitted under the ordinance,[6] a violation Defendant asserts is "separate and distinct from the display of any umbrellas with advertising logos." Demers Affidavit ¶ 28.

On January 15, 2003, Plaintiff brought its first Complaint (Docket Item No. 1) and Motion for Preliminary Injunction (Docket Item No. 2) in this Court, claiming it faced irreparable injury if it did not obtain its liquor license or could not use its outdoor umbrellas. Shortly thereafter, the Town renewed Plaintiff's liquor license once Plaintiff had paid $25 each for the two signs attached to the exterior of its building and obtained a permit. *See id.* ¶¶ 54–56; *see also* Order on Plaintiff's Motion for Preliminary Injunction ("Order")

(Docket Item No. 15) at 4. Noting that Plaintiff *had* in fact obtained its liquor license at the time of the Court's Order and that Plaintiff did not intend to put its umbrellas out until May of 2003, this Court denied Plaintiff's first Motion for Preliminary Injunction, finding no irreparable injury. *See* Order at 6–7. Plaintiff has now obtained new counsel and filed a Verified Amended Complaint (Docket Item No. 32) and a Second Motion for Preliminary Injunction, contending that the Town of Kennebunk sign ordinance is facially unconstitutional in a number of ways, and that Defendants have selectively enforced the ordinance against Plaintiff only. Plaintiff maintains that it will be irreparably injured by the continued enforcement of the ordinance and, therefore, asks this Court to enjoin enforcement of the ordinance pending the outcome of this case.

The Town of Kennebunk Zoning Ordinance, which became effective on February 13, 1989, governs the use of signs and asserts that its purpose is "to permit such signs that will not, by their size, location, construction, or manner of display, endanger the safety of individuals, confuse, mislead or obstruct the vision necessary for traffic safety, or otherwise endanger the public health, safety and welfare." *See* Ordinance, Art. 10, § 7(a), attached as Exhibit 1 to Bartley Declaration (Docket Item No. 27). The ordinance defines a sign as "[a]ny object, device, display or structure, or part thereof which is used to advertise, identify, display, direct or attract attention to an object, person, institution, organization business, product, service, event, or location by any means, including words, letters, figures, design, symbols, fixtures, colors, illumination or projected images." *Id.* Art. 10, § 7(C)(1).

---

6. Bartley's Dockside Restaurant is located in Kennebunk's Lower Village, an area where sign usage is governed by Article 10, Section 7(e)(2) of the Town of Kennebunk Zoning Ordinance, which allows a maximum of three signs per single use lot. *See* Order at 2.

The ordinance requires a permit for any sign "erected, altered, moved or demolished" and requires that such permit be obtained from the Town's Code Enforcement Officer. *Id.* Art. 4, § 1. Pursuant to the ordinance, a permit is to be issued "only if the building plans and/or intended use(s) fulfill the requirements of the applicable provisions of [the]Ordinance...." *Id.*

The ordinance lists eight sign types to be governed by its sign standards, including attached signs, permanent ground signs, temporary/portable signs, joint identification signs, advertisement signs, identification signs, directional signs, and off-premise signs.[7] *Id.* at Art. 10, § (C)(3)(a)-(h). Each zoning district (residential, business, or industrial) has particular sign standards, which include maximum number of signs per lot, maximum sign sizes, types of signs permitted, minimum setbacks, and maximum heights. *Id.* Art. 10, § 7(E)(1)-(3). The ordinance also contains a list of exemptions as follows which include:[8] signs bearing only property numbers, post box numbers, and/or names of occupants of the premises; signs erected and maintained pursuant to the discharge of governmental functions or required by law, ordinance, or government regulation; integral decorative or architectural features of buildings, provided they do not include letters, trademarks, moving parts or moving lights; signs directing and guiding traffic and parking on private property, provided they contain no commercial matter; awnings, except that awnings containing identification or advertising matter count toward the maximum number of signs allowed per lot; real estate signs; subdivision or tract name signs; fuel signs; memorial signs or tablets and names of historic buildings with date of erection; civic group signs; "Posted," "No Trespassing," "Beware of Dog," and "Private Driveway" signs; temporary holiday decorations; signs of non-profit agencies; school scoreboards; and, service bay instruction signs (*e.g.*, for automatic teller machines (ATMs) and food boards for drive-in restaurants).[9] *Id.* Art. 10, § 7(D)(1)-(16). No exception exists for political signs, and in fact such signs are prohibited except for a limited duration of time around elections: twenty-one days prior to an election and seven days after the election. *Id.* Art. 10, § 7(F)(7).

## II. DISCUSSION

Plaintiff puts forth several bases upon which it urges this Court to enjoin enforcement of the Town of Kennebunk's sign ordinance. First, it asserts that the ordinance is facially unconstitutional, in violation of the First and Fourteenth Amendments of the United States Constitution; Article 1, Section 4 of the Maine Constitution; the Equal Protection Clause; and 42 U.S.C. § 1983. Plaintiff argues that the ordinance is facially unconstitutional with respect to both commercial and non-commercial speech because it is content-based

7. An off-premise sign is defined as "[a] sign which directs attention to a business, commodity, service or entertainment, conducted, sold or offered at a location other than the premises on which the sign is located." Ordinance, Art. 10, § 7(C)(3)(h). On on-premise sign is one that does the same as the above except that it concerns subject matter at the same location where the sign is located. Off-premise and on-premise signs are also referred to as off-site and on-site signs. The Court will refer to them interchangeably throughout this opinion.

8. The ordinance notes that off-premises signs are not permitted under these exemptions unless specifically noted. Ordinance, Art. 10, § 7(D).

9. Most of the excepted signs must nonetheless meet certain square footage limitations specified in the ordinance.

and overbroad. Second, Plaintiff claims that the ordinance places unbridled discretion in its enforcement in the hands of Defendants and, therefore, constitutes an unconstitutional prior restraint. Finally, Plaintiff asserts that Defendants have selectively enforced the ordinance against Plaintiff only. Defendants respond that the provisions of the sign ordinance are lawful. The Court will separately assess each of Plaintiff's claims against the injunction standard.

■ In order to obtain a preliminary injunction, four factors must be met. A party seeking an injunction must show that: (1) it will suffer irreparable injury if the injunction is not granted; (2) such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) it has exhibited a likelihood of success on the merits; and (4) the public interest will not be adversely affected by the granting of an injunction. *See Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981); *Merrill Lynch v. Bennert*, 980 F.Supp. 73, 74 (D.Me.1997).

## A. Facial Unconstitutionality Claim—Commercial Speech

Plaintiff challenges the Town of Kennebunk's sign ordinance as being facially unconstitutional. *See* Verified Amended Complaint (Docket Item No. 32) ¶¶ 114–116; Motion for Prelim. Inj. at 9. Plaintiff alleges that the ordinance makes content-based distinctions with respect to both commercial and noncommercial speech to determine what is and is not restricted, and that these regulations fail to pass strict scrutiny. The First Amendment's Free Speech Clause holds that "Congress shall make no law... abridging the Freedom of Speech." U.S. Const. amend. I. The Fourteenth Amendment applies this limitation to the states. The Supreme

Court has found that "signs are a form of expression protected by the Free Speech Clause." *City of Ladue v. Gilleo*, 512 U.S. 43, 48, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994). However, the Court has also found that signs "pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation. It is common ground that governments may regulate the physical characteristics of signs...." *Id.* Nevertheless, because "regulation of a medium inevitably affects communication itself," the Court will engage in the standard framework for evaluating a First Amendment challenge. *Id.*

■ When faced with a First Amendment challenge to a speech regulation, the first step is to determine whether the regulation is content-based. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Restrictions on the time, place, and manner of speech are permissible if they advance a significant governmental interest, are justified without reference to the content of speech, and leave open "ample alternative channels for communication of the information." *Matthews v. Town of Needham*, 764 F.2d 58, 59 (1st Cir.1985) (*citing Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 516, 101 S.Ct. 2882, 2897, 69 L.Ed.2d 800 (1981)). That is, such content-neutral regulations are submitted to less exacting scrutiny than those that are content-based. A regula-

tion is content-based when the content conveyed determines whether the speech is subject to the restriction. *North Olmsted Chamber of Commerce v. City of North Olmsted,* 86 F.Supp.2d 755, 763 (N.D.Ohio 2000) (*citing City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 429, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993)). Content-based regulations are subject to strict scrutiny, *see Ackerley Communications of Massachusetts, Inc. v. City of Cambridge,* 88 F.3d 33, 36 (1st Cir.1996), and, therefore, must be both necessary to promote a compelling state interest and narrowly drawn to achieve that end. *Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (citations omitted). Because Plaintiff has moved for a preliminary injunction, the Court will consider the challenge to the facial constitutionality of the ordinance with an eye towards whether the test for a preliminary injunction is satisfied.

■ Plaintiff argues that the sign ordinance "is shot through with content-based classifications that discriminate amongst different commercial messages." Second Motion for Prelim. Inj. at 13. Although commercial and noncommercial speech are both protected under the First Amendment, "[t]he Constitution ... accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." *S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1142 (9th Cir.1998) (*citing Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). Nevertheless, Plaintiff argues that the Town's ordinance is content-based, and that this Court should apply strict scrutiny in evaluating the ordinance's content-based regulations on commercial speech. *See* Second Motion for Prelim. Inj. at 10. However, the Court disagrees with Plaintiff's conclusion that

strict scrutiny must be applied to the ordinance's provisions affecting commercial speech. In the First Circuit, regardless of whether a regulation of commercial speech is content-based, the test put forth in the Supreme Court's *Central Hudson* opinion, not strict scrutiny, will be applied to evaluate the regulation's constitutionality. *See Consolidated Cigar Corp. v. Reilly,* 218 F.3d 30, 42 (1st Cir.2000) (*rev'd* on other grounds) (*citing Greater New Orleans Broadcasting Ass'n v. United States,* 527 U.S. 173, 184, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999)); *see also Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 554–55, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (rejecting attempt by plaintiff to eliminate the *Central Hudson* test and apply strict scrutiny to regulations on commercial speech the same as would be applied to regulations on noncommercial speech).

■ The *Central Hudson* test prescribes a four-part analysis for determining if regulations of commercial speech pass constitutional muster. First, the speech must concern lawful activity and must not be misleading. Second, the speech regulation must seek to implement a substantial government interest. In this case, there is no dispute that the speech at issue is lawful and is not misleading. In addition, it is well-established that traffic safety and aesthetics, the asserted interests of the Town in implementing this ordinance, *see* Art. 10, § 7(A), are substantial government interests. *See Metromedia,* 453 U.S. at 507–08, 101 S.Ct. 2882, 69 L.Ed.2d 800. Third, the regulation must directly advance that interest, and finally, the regulation should reach no further than necessary to accomplish the government objective. *Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343, 65 L.Ed.2d 341.

Evaluating the last two *Central Hudson* factors "basically involve[s] a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those

ends." *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 341, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986). Plaintiff argues that even applying the *Central Hudson* test, the ordinance is unconstitutional. According to Plaintiff, this is so because, despite any substantial interests underlying the sign ordinance, the means used to implement that interest provide only "ineffective or remote support." Second Motion for Prelim. Inj. at 14–15. Plaintiff points to the many exemptions from the ordinance's regulations set forth in Article 10, Section 7(D) as examples of impermissible content-based classifications promulgated by the ordinance that fail to effectively realize the asserted governmental interests.

In *Metromedia,* the Supreme Court reviewed an ordinance imposing substantial prohibitions on outdoor advertising displays within the city of San Diego in the interest of traffic safety and aesthetics. The San Diego ordinance banned all outdoor advertising except that which advertised "onsite" activities and that which fell within certain listed exceptions. *Metromedia,* 453 U.S. at 494, 101 S.Ct. 2882, 69 L.Ed.2d 800. The Court ruled that the portion of San Diego's ordinance prohibiting offsite commercial signs but allowing onsite commercial signs was constitutional, given the city's interest in traffic safety and aesthetics. *See id.* at 511–12, 453 U.S.

490, 101 S.Ct. 2882, 69 L.Ed.2d 800. The Court found that the city could permissibly "value one kind of commercial speech—onsite advertising—more than another kind of commercial speech—offsite advertising." *Id.* at 512, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800. Nevertheless, the plurality opinion in *Metromedia* invalidated the San Diego ordinance in its entirety, stating that it impermissibly discriminated on the basis of content by permitting onsite commercial speech while broadly prohibiting noncommercial messages that did not fall within the various exceptions. *Id.* at 514–15, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800.[10] However, germane to the ordinance at hand is the Court's clear indication that a governmental body may permissibly value one form of commercial speech over another.

■ The Town of Kennebunk's sign ordinance as it pertains to commercial speech satisfies the third and fourth prongs of the *Central Hudson* test. Under the third prong, the Town's regulations directly and materially advance the asserted governmental interests. First, Plaintiff's argument that the exemption for gas stations is an impermissible content-based classification discriminating amongst different commercial messages is unavailing. *See* Second Motion for Prelim. Inj. at 13; *see also* Ordinance, Art. 10, § 7(D)(9).[11] However, Plaintiff incorrectly

---

**10.** The difference between the exemptions in *Metromedia* and the exemptions in the Town of Kennebunk's sign ordinance is that in *Metromedia* the exemptions were from a general ban, whereas the exemptions at issue in the Kennebunk sign ordinance are not from a general ban, but from the various regulations; namely, the sign limit per lot.

**11.** Article 10, § 7(D)(9) reads:
The following shall not be included in the application of the regulation herein

. . . . . .

Fuel price/informational signs meeting the following standards:

1. Sign size limited to one (1) sq. ft. each;
2. One (1) sign permitted per pump and per other product sold on premises;
3. Sign must be affixed to pump;
4. Sign must advertise motor vehicle fuel or motor vehicle product sold on premises; and
5. Information attached to pump and describing how to use fuel pump is exempt from standards.

interprets this exemption, stating that it allows a gas station to "crowd its fuel pumps with an *unlimited* number of signs advertising motor vehicle fuel and other motor vehicle·products sold on the premises." Second Motion for Prelim. Inj. at 13 (emphasis added). The plain language of the ordinance, however, clearly does *not* allow an unlimited amount of signs—it specifically holds that only *one* sign is permitted per pump and per other product sold on premises. *See* Ordinance, Art. 10, § 7(D)(9)(2). Given the language of the ordinance as it stands, this Court cannot conclude that it constitutes an unreasonable judgment by the Town of Kennebunk. The Town could reasonably determine that making information known about the fuel that customers are buying takes precedence over its interest in preventing visual blight. *Cf. Metromedia,* 453 U.S. at 512, 101 S.Ct. 2882, 69 L.Ed.2d 800 ("[T]he city could reasonably conclude that a commercial enterprise—as well as the interested public—has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere.") By allowing one sign per pump or product sold, the Town has decided to make important consumer information known but, at the same time, has placed limits on the display of the information so as to accord with its other interests.[12] Valuing this type of commercial speech over other types of commercial speech is permissible pursuant to *Metromedia.*

Further, limiting the number of signs per lot materially advances the common-sense judgments of the local lawmakers that an excessive number of signs may

pose a hazard to traffic safety and detracts from the visual attractiveness of this tourist-town. *See Metromedia,* 453 U.S. at 509, 101 S.Ct. 2882, 69 L.Ed.2d 800. The means chosen by the Town are not more restrictive than necessary. In *Metromedia,* the Supreme Court stated, "the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them." *Metromedia,* 453 U.S. at 508, 101 S.Ct. 2882, 69 L.Ed.2d 800. In *Board of Trustees of the State of New York v. Fox,* 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), the Supreme Court pointed out that a regulation of commercial speech does not have to employ the least restrictive means and that, when restrictions have been disallowed under *Central Hudson*'s fourth prong, such restrictions have been "substantially excessive, disregarding 'far less restrictive and more precise means.'" *Id.* at 479, 109 S.Ct. 3028 (*quoting Shapero v. Kentucky Bar Assn.,* 486 U.S. 466, 476, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988)). The Court then specifically mentioned that controlling the size and appearance of signs would, in fact, be a less restrictive means of meeting a city's concerns for safety and aesthetics, but that in its *Metromedia* opinion, the Court did not require such less restrictive means and upheld the complete ban on off-site billboard advertising. *See id.*

The instant ordinance is less restrictive than that upheld by the Court in *Metromedia* and later cases, *see, e.g., Posadas,* 478 U.S. at 344, 106 S.Ct. 2968, 92 L.Ed.2d 266; *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 539, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987), and, in fact, utilizes those means specifically cited by the *Fox* court

---

**12.** Similarly, the ordinance provides exemptions for service bay instruction signs such as signs for ATMs and food boards for drive-in restaurants, provided these signs display no

more information than that which is needed by an individual utilizing the service bay or drive-in facility. *See* Ordinance, Art. 10, § 7(D)(16).

as less restrictive. The ordinance at issue in *Metromedia* banned *all* outdoor signs *except* for on-premises commercial advertising and those signs listed in the various exceptions. *Metromedia*, 453 U.S. at 494, 101 S.Ct. 2882, 69 L.Ed.2d 800. The Town of Kennebunk's ordinance does not ban all signs, either on-premises or off-premises, but simply limits the number of signs one lot may have and establishes certain size limitations and set-back requirements, regardless of what message it conveys or whether it is an on-premises sign or an off-premises sign. Given that the ordinance in question in this case employs less restrictive means than those that have been upheld in the past to support a local government's interest in traffic safety and aesthetics, the Court sees no reason to strike them down here.

Furthermore, the exemptions for certain on-site signs do not detract from the Town's ultimate purpose in enacting the sign ordinance. There are several cases that have upheld ordinances containing exemptions from certain sign regulations. The court in *Lavey v. City of Two Rivers*, 171 F.3d 1110 (7th Cir.1999), upheld an ordinance remarkably similar to the one at hand. The ordinance in *Lavey* required a permit "for any sign or awning erected, constructed, enlarged or structurally modified within the City." *Id.* at 1111. The ordinance contained exemptions from the permit requirement for certain signs. Such exemptions were applied to construction signs, government signs, house number and name plate signs, interior signs, memorial signs and plaques, "no trespassing" or "no dumping" signs, public notice signs, political signs, real estate signs, vehicular signs, and neighborhood identification signs.[13] *Id.* at 1112 n. 5. Much like Plaintiff in the instant case, the plaintiff in *Lavey* argued that the ordinance was not constitutional because it lacked an adequate fit between the distinctions made by the ordinance and the ordinance's safety and aesthetic goals. *Id.* at 1115. The court however, adopted the view that the ordinance was in fact "carefully-crafted" to meet the safety and aesthetic goals it articulated, and that its exemptions were "fully justified." *Id.* at 1115–16.[14]

The Court finds in this instance that the exemptions in the Town of Kennebunk's sign ordinance are fully justified, and reflect "appropriate governmental interest[s]." *Mosley*, 408 U.S. at 95, 92 S.Ct. 2286, 33 L.Ed.2d 212. Like the *Lavey* court, this Court does "not read *Discovery Network* as requiring a local legislature to make a voluminous record in order to jus-

---

**13.** In fact, the only real difference between the ordinance in *Lavey* and the ordinance at issue in this case is that the *Lavey* ordinance provided an exemption for political signs, something not provided by the Town of Kennebunk ordinance. The issue of the ordinance's restrictions on political signs will be addressed below because it pertains to restrictions on noncommercial speech. Another difference is that the plaintiff in *Lavey* was challenging the exceptions to restrictions on off-premises commercial advertising. The challenge in the instant case is not so limited.

**14.** Other courts have ruled that similar exemptions are constitutional. In *Lamar Adver. Co. v. City of Douglasville*, 254 F.Supp.2d 1321 (N.D.Ga.2003), the court found that the provisions of an ordinance allowing government signs within the public right-of-way, drive-through menu boards, subdivision designations, and directional signs did not constitute impermissible content-based regulations. In making its ruling, the court cited the earlier decision of the Court of Appeals for the Eleventh Circuit in *Messer v. City of Douglasville*, 975 F.2d 1505 (11th Cir.1992), which found that regulations exempting "for sale" signs, construction identification signs, and directional traffic signs do not favor one form of speech over another and, as such, did not violate the First Amendment. *Lamar Advertising*, 254 F.Supp.2d at 1332 (*citing Messer*, 975 F.2d at 1513).

tify such common-sense exceptions." *Lavey*, 171 F.3d at 1116 (*citing Fox*, 492 U.S. at 477–81, 109 S.Ct. 3028, 106 L.Ed.2d 388.) The exemptions set forth in the Kennebunk sign ordinance are neutral, common-sense exceptions that do not derail the fit between the Town's safety and aesthetic goals and its means chosen to achieve those goals.

As this Court has previously acknowledged, when analyzing the factors necessary to obtain a preliminary injunction, it is the likelihood of success that is the *sine qua non* of this examination. *Rencor Controls, Inc. v. Stinson*, 230 F.Supp.2d 99 (D.Me.2002) (*quoting New Comm Wireless Servs. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir.2002)). Applying the *Central Hudson* test to the ordinance at hand results in the conclusion that the Town of Kennebunk's sign ordinance furthers substantial government interests, and it does so in a reasonable fashion that is no more restrictive than necessary. Therefore, Plaintiff has not shown a likelihood of success on the merits of its facial unconstitutionality claim with regard to commercial speech.

Given that Plaintiff has not shown a likelihood of success on this claim, it cannot show the irreparable injury that flows from a First Amendment violation. Further, Plaintiff's other claim of irreparable harm equally fails. Plaintiff claims that by being unable to put its umbrellas outside and thereby provide shade for its customers, it is losing business to other restaurants that can put their umbrellas out. *See* Second Motion for Prelim. Inj. at 18. However, Plaintiff certainly is not precluded from putting out umbrellas with no logos or trademarks on them. Such fixtures do not come within the strictures of the sign ordinance and, therefore, Plaintiff is free to put out as many logo-free umbrellas as it wishes. If Plaintiff is forced

to pay for new umbrellas in order to comply with the ordinance, it may assert a claim for damages in that respect, but that impediment plainly does not merit the granting of a preliminary injunction.

## B. Unconstitutional Prior Restraint Claim

Article 10, section 7(B) of the sign ordinance states that "[i]t shall be unlawful for any person to erect, repair, alter or relocate any sign, except as exempted under 7.D below without first obtaining a sign permit from the Code Enforcement Officer." The Code Enforcement Officer may issue a permit only if "the building plans and/or intended uses fulfill the requirements of the applicable provisions of this ordinance...." *Id.* Art. 4, § 1(A). The applicable provisions reside in the particular section on signs, Article 10.

Plaintiff contends that the ordinance's permit scheme gives unbridled discretion to the Code Enforcement Officer and, as such, constitutes an unconstitutional prior restraint on speech. Defendants disagree, asserting that the ordinance provides sufficient standards to guide the Code Enforcement Officer's discretion. A prior restraint gives a government official "the power to deny use of a forum in advance of actual expression." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975). The Town of Kennebunk's permitting scheme is subject to prior restraint analysis because it requires official permission in the form of a permit from the Code Enforcement Officer in order to engage in expressive activity. *See Infinity Outdoor, Inc., v. City of New York*, 165 F.Supp.2d 403, 425 (E.D.N.Y.2001).

The doctrine of prior restraints "guards against the threat of government censorship by requiring that public licensing and permit schemes contain adequate substantive and procedural safe-

guards against arbitrary (or content-based) State action." *New Eng. Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 21 (1st Cir.2002) (*citing FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 225–26, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)). A prior restraint is not unconstitutional *per se, Southeastern Promotions*, 420 U.S. at 558, 95 S.Ct. 1239, 43 L.Ed.2d 448; a system of prior restraint is constitutional if it both sufficiently limits the discretion of the licensing authority and provides procedural protections against misapplication. *See id.* at 559, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448; *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).

Recently, the Supreme Court had occasion to revisit the issue of what protections are required within a system of prior restraint and, in so doing, erased some of the uncertainty surrounding that question. In *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002), the Court held that the procedural requirements that it had previously established in *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), do not apply to a permit or licensing scheme that does not condition expression on a licensing body's approval of content. *Thomas*, 534 U.S. at 321–22, 122 S.Ct. 775, 151 L.Ed.2d 783.[15] At the same time that it fine-tuned the procedural requirements of a prior restraint system, the Court reiterated the importance of preventing the unbridled discretion of an official. *Thomas* underscored the necessity of definite standards to guide the official in his decision-making process, even when implementing a content-neutral permit scheme. *Thomas*, 534 U.S. at 323, 122 S.Ct. 775, 151 L.Ed.2d 783.

The Town of Kennebunk's permit requirement for signs is a prior restraint because it requires prior approval before the expression begins. However, the Town's permit scheme is, on its face, content-neutral. Unlike *Freedman*, where the board could reject films it considered "obscene," or likely to "corrupt morals" or "incite to crime," in order to issue a permit, the Code Enforcement Officer in Kennebunk must decide whether the sign meets the objective standards set forth for each zoning district.[16] *See* Ordinance, Art. 10, § 7(E).

15. In *Freedman*, before a motion picture could be shown anywhere in the state, a Board of Censors had to approve it. Under that scheme, the Board was to "approve and license such films or views which are moral and proper, and shall disapprove such as are obscene, or such as tend, in the judgment of the Board, to debase or corrupt morals or incite to crimes." *Freedman*, 380 U.S. at 52 n. 2, 85 S.Ct. 734, 13 L.Ed.2d 649. Finding that such a system was one of subject-matter censorship, the Court held that such a process must contain certain procedural safeguards to avoid constituting an invalid prior restraint. Such protections included: (1) any prior restraint must be imposed only for a specified brief period during which the status quo must be maintained, (2) expeditious judicial review must be available, and (3) the censor bears the burden of going to court and proving that the expression must be suppressed. *See FW/PBS*, 493 U.S. at 227, 110 S.Ct. 596, 107 L.Ed.2d 603.

16. The Court notes that Plaintiff has argued that deciding whether a sign is an identification or advertising sign is a content-based determination. *See* Second Motion for Prelim. Inj. at 9. However, the Court sees such a determination as markedly different from one that goes to the matter of whether something is obscene or likely to corrupt morals, something that is clearly a content-based determination. If the decision to issue a permit required the Code Enforcement Officer to determine whether *what* a message advertises, or whether *what* the message says in its advertisement, is proper and, therefore, deserving of a permit, such a scheme would indeed involve content-based determinations. However, simply making the judgment that a sign advertises or does not, or identifies a busi-

Furthermore, also as in *Thomas*, the object of the sign permit system is not to exclude communication of a particular content. It is to contain the number, location, and size of signs for public safety and aesthetic reasons, as well as to "equitably distribute the privilege of using the public environs to communicate private information [and to] [s]afeguard the public use and nature of the streets and sidewalks." Ordinance, Art. 10, § 7(A). *See also Thomas*, 534 U.S. at 322, 122 S.Ct. 775, 151 L.Ed.2d 783 (object of permit system is to "coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event.") That is, in order to be granted a permit, the sign must meet the content-neutral, time, place, and manner restrictions set forth in the ordinance. As the Court noted in affirming the decision of the Court of Appeals in *Thomas*, "to allow unregulated access to all comers could easily reduce rather than enlarge the park's utility as a forum for speech." *Id.* (*quoting Thomas v. Chicago Park District*, 227 F.3d 921, 924 (7th Cir.2000), *cert. granted*, 532 U.S. 1051, 121 S.Ct. 2191, 149 L.Ed.2d 1023 (2001)).

Hence, in order to be found constitutional, the Town's permit scheme must contain "narrow, objective, and definite" criteria to guide its permit determinations. *New England Regional Council of Carpenters*, 284 F.3d at 25 (*quoting Shuttlesworth*, 394 U.S. at 151, 89 S.Ct. 935, 22 L.Ed.2d 162).

The Court finds that the instant ordinance meets these requirements. In deciding whether to grant a permit, the Code Enforcement Officer's discretion is limited. Whether or not a permit shall issue depends wholly upon whether the proposed sign is within the maximum number of signs permitted for each zoning district; whether it meets the square footage, height, and setback requirements; and, provided it is one of the allowed types of signs, it is not located on the roof of a building; and whether it meets the restrictions on illuminated signs.[17] *See* Ordinance, Art. 10, § 7(E). The ordinance "does not authorize a licensor to pass judgment on the content of speech: None of the grounds for denying a permit has anything to do with what a speaker might say." *Thomas*, 534 U.S. at 322, 122 S.Ct. 775, 151 L.Ed.2d 783. Instead, the ordinance provides only objective, content-neutral criteria to guide its enforcement.

This is unlike the sign permit system considered in *Lamar Advertising Co. v. City of Douglasville, Georgia*, 254 F.Supp.2d 1321 (N.D.Ga.2003), where the court found certain portions of the ordinance to be unconstitutional prior restraints. In *Lamar*, the director of planning and zoning could grant a temporary sign permit for signs normally prohibited in the town. However, all that the sign ordinance said with regard to how the director should go about granting a permit was that he was "authorized" to do so. *Id.* at 1328. The ordinance gave no precise and objective criteria to guide the director's decision and, therefore, the court

---

ness or does not, falls far short of making a judgment on the content conveyed by an advertisement.

**17.** The Code Enforcement Officer also must issue a permit for temporary signs. *See* Ordinance, Art. 10, § 7(G)(1). The ordinance provides definite, objective standards for deciding when a temporary permit shall issue. The relevant provision gives a maximum square footage requirement and time limit for portable signs and banners and prohibits signs "which prevent[ ] safe vehicular or pedestrian passage along public rights-of-way or sidewalks." *See id.* Art. 10, § 7(G)(2)-(4).

found he had "unbridled discretion to permit or prohibit expressive activity." *Id.* The court also pointed out that the amendment to the ordinance clarifying that the director of planning and zoning was limited to applying those standards outlined in the sign ordinance did not cure the ordinance of its unconstitutionality; this because when no standards were listed in the original ordinance, the amendment did not provide any.[18] *Id.* at 1329.

■ By contrast, in the case at bar, there are objective standards provided to aid the Code Enforcement Officer in his decision as to whether or not to grant a sign permit. From the plain language of the ordinance, he does not have the power to grant or deny a permit based on the message conveyed by the sign. If the proposed sign meets the objective, physical requirements of the sign ordinance, a permit will be issued. In fact, the *Lamar* court specifically contrasted the lack of standards of the sign permit system before it with what it thought would be objective standards of such a system: standards regarding size, shape, or height— the precise standards present to guide the Kennebunk Code Enforcement Officer's discretion. *See Lamar*, 254 F.Supp.2d at 1330. Clearly, from the face of the ordinance, its intent is not to allow the Code Enforcement Officer to "encourage[ ] some

views and discourage[ ] others through the arbitrary grant or denial of . . . sign permits." *Lamar*, 254 F.Supp.2d. at 1328–29. To do so would, of course, be unconstitutional. The ordinance prescribes criteria to guide the permit determination that "are reasonably specific and objective, and do not leave the decision 'to the whim of the administrator.'" *Thomas*, 534 U.S. at 324, 122 S.Ct. 775, 151 L.Ed.2d 783 (*quoting Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992)).[19] The Court does not find that Plaintiff has shown a likelihood of success on the merits of its claim that the Town's permit scheme results in a system of unconstitutional prior restraints. Thus, the Court will not issue an injunction on that basis. Furthermore, for the same reasons that Plaintiff cannot show irreparable harm stemming from its facial unconstitutionality claim with regard to commercial speech, it cannot do so on its unconstitutional prior restraint claim.

### C. Selective Enforcement Claim

Plaintiff claims that Defendants selectively and discriminatorily enforced the sign ordinance against it based on impermissible considerations, including religious bias and the intent to punish B & B for exercising its constitutionally protected speech rights. *See* Second Motion for Prelim. Inj. at 16. Specifically, Plaintiff

---

**18.** The *Lamar* court found that, for similar reasons, the ordinance there granted the City too much discretion in determining when to permit a variance from the applicable sign regulations, *Lamar*, 254 F.Supp.2d at 1329, as well as too much discretion in deciding whether to approve or deny signs for display in the historic district of the City. *Id.* at 1330. *See also Granite State Outdoor Adver., Inc. v. City of Clearwater*, 213 F.Supp.2d 1312, 1339 (M.D.Fla.2002) (finding too much discretion where ordinance allowed official to approve signs on a case-by-case basis, and where officials could grant exceptions from sign permit requirement for signs required or erected by

permission of the city manager or city commission).

**19.** Moreover, the ordinance provides for expeditious review of any decision of the Code Enforcement Officer. An aggrieved party may appeal to a Board of Appeals, which must determine a hearing date within twenty (20) days from the filing of an appeal, and must render a decision within thirty (30) days following the hearing on such appeal. A party may then appeal to the Maine Superior Court, in accordance with Maine law. *See* Ordinance, Art. 6, § 3.

asserts that Defendants decided to selectively enforce the ordinance against Bartley's Dockside Restaurant in order to retaliate against Brian Bartley for his plan to thwart the proposed *Kennebunkport* bus ordinance, which Plaintiff asserts restricts bus access to *Kennebunk*. The Kennebunkport Town Selectmen were scheduled to vote on the matter on July 25, 2002. *See id.* Plaintiff further maintains that Defendants' selective enforcement resulted from an anti-semitic animus on the part of Code Enforcement Officer Paul Demers, who allegedly forbade only the use of the umbrellas bearing the trademark "Hebrew National Franks," calling them "personally offensive." *Id.*

■ The Fourteenth Amendment's Equal Protection Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Such protection has been established not only to assure that intentional and arbitrary discrimination is not promoted by the express terms of a statute, but also to ensure that it is not done through a statute's "improper execution through duly constituted agents." *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445, 43 S.Ct. 190, 67 L.Ed. 340 (1923) (citations omitted); *see also Wal–Mart Stores, Inc. v. Rodriguez*, 238 F.Supp.2d 395, 416 (D.P.R.2002) (quoting same).

■ "The Equal Protection Clause prohibits selective enforcement based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *United States v. Batchelder*, 442 U.S. 114, 125, n. 9, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979) (*quoting Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962)). Liability depends upon "proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Yerardi's Moody Street Restaurant & Lounge, Inc. v. Board of Selectmen of Town of Randolph*, 932 F.2d 89, 92 (1st Cir.1991) (*citing Yerardi's Moody Street Restaurant & Lounge, Inc. v. Board of Selectmen of Town of Randolph*, 878 F.2d 16, 21 (1st Cir.1989) (citation omitted)). Or, if there is no evidence of racial, religious, or speech discrimination, "there must be evidence from which a jury reasonably could find that the [defendant] acted with malicious or bad faith intent to injure [the plaintiff]." *Id.* Courts have recognized, however, that proving such illegitimate animus and malicious intent is an onerous burden. *See Wal–Mart*, 238 F.Supp.2d at 417 (*citing Olech v. Village of Willowbrook*, 160 F.3d 386, 388 (7th Cir. 1998); *Rubinovitz v. Rogato*, 60 F.3d 906, 911 (1st Cir.1995)).

■ Plaintiff has failed to meet this heavy burden. At most, Plaintiff has shown that Defendants were previously inconsistent, and perhaps inefficient, in the enforcement of the Town's sign ordinance. In his testimony before this court, Defendant Demers stated that on July 25, 2002, he undertook to inspect all of the premises in the Lower Village district, which included the premises of Bartley's Dockside Restaurant. He did so in response to the mounting volume of complaints he had received, principally from one of Plaintiff's neighboring businesses, regarding Plaintiff's excessive number of signs. Defendant Demers also candidly admitted that, up until that point, the sign ordinance had not been energetically enforced against

any person or business. However, even if the Town was less than consistent in its previous enforcement of the sign ordinance, and even if Mr. Demers did conduct his general sign inspection in the Lower Village on July 25, 2002, with the deliberate intention of ultimately inspecting the premises of Bartley's Dockside Restaurant, the Court is not convinced that Defendants' actions were unconstitutional.

Neither of the bases put forth by Plaintiff as the unconstitutional motive behind Defendants' recent sign inspections is supported by the evidence. First, the Court finds wholly unconvincing the contention that the inspection was conducted in an effort to retaliate against Plaintiff for his opposition to the Town of *Kennebunkport's* bus ordinance. Plaintiff's only evidence to support this assertion is that the sign inspection took place the same day that the Town of Kennebunkport was to vote on the passage of its bus ordinance restricting bus access to Kennebunk. There is no proof of any nexus between the anticipated effect of the passage of the Kennebunkport bus ordinance and the actions of the officials of Kennebunk. Plaintiff has put forth no evidence that any member of the Board of Selectmen for the Town of Kennebunk or Mr. Demers had any knowledge, interest, or connection with its neighboring town's ordinance, much less that they knew of any opposition by Plaintiff to it. The record does not show that any officer or agent of the Town of Kennebunk ever expressed an opinion about or took a position on the bus ordinance of the neighboring town.

The Court is equally unconvinced that Defendant Demers enforced the sign ordinance against Plaintiff because of an unconstitutional religious bias. The only evidence of such a bias is the testimony of Plaintiff Brian Bartley that Defendant Demers made what he took to be anti-semitic comments with regard to his "Hebrew National" umbrellas when Mr. Demers allegedly said he found them to be "personally offensive," and suggested that Plaintiff should serve "the same food as everyone else." The credibility of this testimony is severely undermined by other credible evidence. First, Mr. Demers emphatically denied that he made any such statements. Second, Mr. Demers testified that he took photographs of Bartley's Restaurant and the umbrellas on July 25, 2002. Those photographs were admitted in evidence at the preliminary injunction hearing. *See* Defendant Exhibit 12. The photographs portray that the various umbrellas in front of Bartley's on July 25, 2002, bore the "Poland Spring" and "Shipyard Ale" logos, as well as the "Hebrew National" logo. *See id.* These photos undercut Plaintiff's claim that *all of* the umbrellas in front of the restaurant on the day Defendant Demers made his sign inspection bore the "Hebrew National" logo and that, when he said all of the umbrellas in front "have to go," he was deliberately singling out the "Hebrew National" umbrellas. The Court does not see any reason to believe that these photographs are not authentic or were not, indeed, taken on July 25, 2002.

Further, every other witness who had dealt personally with Mr. Demers in his official capacity clearly asserted that they had never heard him make any statement even implying any anti-semitic bias, or that they witnessed him otherwise acting in any way that would reflect such a bias. All of those witnesses described Mr. Demers as being polite, reasonable and "professional" in his dealings with them. The Court finds that the testimony of these witnesses, in combination with the photographs and the testimony of Mr. Demers to be persuasive evidence contradicting the uncorroborated testimony of Brian Bartley asserting that Mr. Demers acted out of some

anti-semitic impulse spurred by the umbrella logos.

Plaintiff's evidence falls far short of that necessary to prove an illegitimate motive.[20] Plaintiff has not shown to the satisfaction of the Court that Mr. Demers and the Town's enforcement of the ordinance was based *at all* upon any sort of religious animus or bias or upon any form of speech discrimination. At most, Plaintiff has shown that Mr. Demers inspected the premises of Bartley's Dockside Restaurant, found them to be in violation of the ordinance for good reason, and continued in his efforts to see that Bartley's complied with the sign ordinance because of the numerous complaints he had received from neighbors regarding the excessive number of signs Bartley's had on its premises. Such a motive on the part of Mr. Demers or the Town is not equivalent to an unconstitutional religious bias or to speech discrimination, nor does it show malicious or bad-faith intent to injure, as is required to successfully make out a selective enforcement claim. Finding no likelihood of success on the merits of the selective enforcement claim, the Court will not enjoin the Town of Kennebunk's enforcement of its sign ordinance.

### D. Facial Unconstitutionality Claim— Noncommercial speech

Plaintiff argues that the Town of Kennebunk's sign ordinance is facially overbroad and unconstitutionally restricts political speech. Plaintiff contends that the sign ordinance contains no exemptions for political signs and imposes a "flat ban" on political signs in the Residential, Downtown/Lower Village Business, and Industrial zoning districts. Second Motion for Prelim. Inj. at 11 (*citing* Ordinance, Art. 10, §§ 7.D, 7.E(1)(a), 7.E(2)(a), 7.E(3)(a)). The ordinance reads, "Notwithstanding other provisions of this section, the following signs shall not be allowed: . . . [p]olitical signs posted more than twenty-one (21) days prior to election and not removed within seven (7) days after the election." *Id.* Art. 10, § 7(F)(7). Contending that it applies only to "whatever scraps of land remain in the Town" outside the above-listed area, *Second Motion for Prelim. Inj.* at 12, Plaintiff further finds objectionable the provision holding that political signs are prohibited "more than twenty-one (21) days prior to election" and more than "seven (7) days after the election," Ordinance, Art. 10, § 7.F(7); *see also* Second Motion for Prelim. Inj. at 12.[21]

First, the Court does not accept Plaintiff's precise interpretation of the ordinance as it pertains to political speech. The ordinance's provision pertaining to the durational limitations on political signs applies "[n]otwithstanding other provisions of this section," Ordinance at Art. 10, § 7(F). The Court interprets this provision, with the use of the word "notwithstanding," to

---

**20.** Plaintiff did submit affidavits of various individuals attesting that Brian Bartley *told them* about Defendant Demers's allegedly anti-semitic comments, *see* Affidavit of Arnold C. Shapiro (Docket Item No. 28), Affidavit of Richard D. Siegel, Ph.D. (Docket Item No. 29), Affidavit of Joseph H. Van Deventer (Docket Item No. 30), but the Court does not find in this case that such hearsay affidavits substantiate Plaintiff's allegations. The Court is left at the end of the day with *only* Mr. Bartley's assertion that the statement was made by Mr. Demers.

**21.** The Court notes that the term "political" is not defined in the ordinance. In the hearing, however, Mr. Demers testified that an ideological sign that reads, "God Bless America We Stand by our President" would not be a political, and therefore prohibited, sign. Without any definition in the ordinance, however, it is impossible to know just how this provision regarding political signs would be enforced.

mean that these durational limits on political signs apply everywhere in the town, including in the Residential, Downtown/Lower Village Business, and Industrial zoning districts. That is, there is not a "flat ban" on political signs, but there is a time limit placed on when such signs may lawfully be posted in the town.

Nevertheless, regardless of what this provision in fact means, Plaintiff does not have standing to challenge it. It is true that in the First Amendment arena, the Supreme Court has relaxed the rules of standing to allow a litigant whose own activities could be constitutionally regulated by a particular statute or regulation standing to sue and to challenge that regulation as overbroad, thereby asserting the injuries of others not before the court. *See Village of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 634, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *see also Bigelow v. Virginia,* 421 U.S. 809, 815–16, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973); *Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 392–93, 108 S.Ct. 636, 643, 98 L.Ed.2d 782, (1988). However, in order to have standing under these relaxed rules, "an individual must present more than [a]llegations of a subjective chill. There must be a claim of specific present objective harm or a threat of specific future harm." *Bigelow,* 421 U.S. at 816–17, 95 S.Ct. 2222, 44 L.Ed.2d 600 (internal citation omitted). That requirement is met where there is a credible threat of prosecution if the plaintiff pursues its activities, *see New Hampshire Right to Life Political Action Committee v. Gardner,* 99 F.3d 8, 14 (1st Cir. 1996), or where the threat of prosecution has already been realized as a conviction, and there can be no doubt concerning the plaintiff's personal stake in the outcome of the controversy. *See Bigelow,* 421 U.S. at 817, 95 S.Ct. 2222, 44 L.Ed.2d 600.

Plaintiff can meet neither of these requirements here.[22] It has not alleged that the specific provision regarding political signs affects it in any way. B & B Coastal does not here contend that it wishes to engage in any sort of political speech; nor does it provide any evidence that any other identifiable individual seeks to do so. It can show no present objective harm or threat of specific future harm resulting from this provision. Plaintiff does not have standing to challenge the provision governing political signs simply by having standing to challenge the sign ordinance's regulation of commercial signs. Therefore, because Plaintiff has no standing to challenge the ordinance's restriction on political speech, the Court will deny Plaintiff's request on this basis for a preliminary injunction.

## III. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiff's Second Motion for Preliminary Injunction be, and it is hereby, **DENIED**.

---

22. Plaintiff cannot meet the *basic* standing requirements on this issue. To show standing under Article III, "the party who invokes a federal court's authority must show that (1) he or she personally has suffered some actual or threatened injury as a result of the challenged conduct; (2) the injury can fairly be traced to that conduct; and (3) the injury likely will be redressed by a favorable decision from the court." *New Hampshire Right to Life Political Action Committee v. Gardner,* 99 F.3d at 13.